In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-1010, 03-1078

BURL MATHIAS and DESIREE MATTHIAS,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

ACCOR ECONOMY LODGING, INC. and MOTEL 6
OPERATING L.P.,

*Defendants-Appellants/Cross-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 6329—**Joan Humphrey Lefkow**, *Judge.*

ARGUED SEPTEMBER 3, 2003—DECIDED OCTOBER 21, 2003

Before POSNER, KANNE, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiffs brought this diversity suit governed by Illinois law against affiliated entities (which the parties treat as a single entity, as shall we) that own and operate the "Motel 6" chain of hotels and motels. One of these hotels (now a "Red Roof Inn," though still owned by the defendant) is in downtown Chicago. The plaintiffs, a brother and sister, were guests there and were bitten by bedbugs, which are making a comeback in the U.S.

as a consequence of more conservative use of pesticides. Kirsten Scharnberg, "You'll Be Itching to Read This: Bedbugs Are Making a Comeback: Blame World Travelers and a Ban on Certain Pesticides," *Chi. Tribune*, Sept. 28, 2003, p. 1; Mary Otto, "Bloodthirsty Pests Make Comeback: Bug Infestations Raising Welts, Ire," *Wash. Post*, Sept. 2, 2003, p. B2. The plaintiffs claim that in allowing guests to be attacked by bedbugs in a motel that charges upwards of $100 a day for a room and would not like to be mistaken for a flophouse, the defendant was guilty of "willful and wanton conduct" and thus under Illinois law is liable for punitive as well as compensatory damages. *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998); *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1978); *Barton v. Chicago & North Western Transportation Co.*, 757 N.E.2d 533, 554 (Ill. App. 2001). The jury agreed and awarded each plaintiff $186,000 in punitive damages though only $5,000 in compensatory damages. The defendant appeals, complaining primarily about the punitive-damages award. It also complains about some of the judge's evidentiary rulings, but these complaints are frivolous and require no discussion. The plaintiffs cross-appeal, complaining about the dismissal of a count of the complaint in which they alleged a violation of an Illinois consumer protection law. But they do not seek any additional damages, and so, provided we sustain the jury's verdict, we need not address the cross-appeal.

 The defendant argues that at worst it is guilty of simple negligence, and if this is right the plaintiffs were not entitled by Illinois law to any award of punitive damages. It also complains that the award was excessive—indeed that any award in excess of $20,000 to each plaintiff would deprive the defendant of its property without due process of law. The first complaint has no possible merit, as the evidence of gross negligence, indeed of recklessness in the strong sense of an unjustifiable failure to avoid a *known* risk, see *Ziarko v.*

*Soo Line R.R.*, 641 N.E.2d 402, 405-09 (Ill. 1994) (plurality opinion); *Landers v. School Dist. No. 203, O'Fallon,* 383 N.E.2d 645, 647-48 (Ill. App. 1978); *Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 645 (7th Cir. 2002) (Illinois law); *Saba v. Compagnie Nationale Air France,* 78 F.3d 664, 667-70 (D.C. Cir. 1996), was amply shown. In 1998, EcoLab, the extermination service that the motel used, discovered bedbugs in several rooms in the motel and recommended that it be hired to spray every room, for which it would charge the motel only $500; the motel refused. The next year, bedbugs were again discovered in a room but EcoLab was asked to spray just that room. The motel tried to negotiate "a building sweep [by EcoLab] free of charge," but, not surprisingly, the negotiation failed. By the spring of 2000, the motel's manager "started noticing that there were refunds being given by my desk clerks and reports coming back from the guests that there were ticks in the rooms and bugs in the rooms that were biting." She looked in some of the rooms and discovered bedbugs. The defendant asks us to disregard her testimony as that of a disgruntled ex-employee, but of course her credibility was for the jury, not the defendant, to determine.

Further incidents of guests being bitten by insects and demanding and receiving refunds led the manager to recommend to her superior in the company that the motel be closed while every room was sprayed, but this was refused. This superior, a district manager, was a management-level employee of the defendant, and his knowledge of the risk and failure to take effective steps either to eliminate it or to warn the motel's guests are imputed to his employer for purposes of determining whether the employer should be liable for punitive damages. *Mattyasovszky v. West Towns Bus Co.*, 330 N.E.2d 509, 512 (Ill. 1975); *Barton v. Chicago & North Western Transportation Co., supra*, 757 N.E.2d at 556 n. 11; *Kennan v. Checker Taxi Co.*, 620 N.E.2d 1208, 1212-14

(Ill. App. 1993); *Restatement (Second) of Torts* § 909 (1979); *Restatement (Second) of Agency* § 217C (1958). The employer's liability for compensatory damages is of course automatic on the basis of the principle of respondeat superior, since the district manager was acting within the scope of his employment.

The infestation continued and began to reach farcical proportions, as when a guest, after complaining of having been bitten repeatedly by insects while asleep in his room in the hotel was moved to another room only to discover insects there; and within 18 minutes of being moved to a third room he discovered insects in that room as well and had to be moved still again. (Odd that at that point he didn't flee the motel.) By July, the motel's management was acknowledging to EcoLab that there was a "major problem with bed bugs" and that all that was being done about it was "chasing them from room to room." Desk clerks were instructed to call the "bedbugs" "ticks," apparently on the theory that customers would be less alarmed, though in fact ticks are more dangerous than bedbugs because they spread Lyme Disease and Rocky Mountain Spotted Fever. Rooms that the motel had placed on "Do not rent, bugs in room" status nevertheless were rented.

It was in November that the plaintiffs checked into the motel. They were given Room 504, even though the motel had classified the room as "DO NOT RENT UNTIL TREATED," and it had not been treated. Indeed, that night 190 of the hotel's 191 rooms were occupied, even though a number of them had been placed on the same don't-rent status as Room 504. One of the defendant's motions in limine that the judge denied was to exclude evidence concerning all other rooms—a good example of the frivolous character of the motions and of the defendant's pertinacious defense of them on appeal.

Although bedbug bites are not as serious as the bites of some other insects, they are painful and unsightly. Motel 6 could not have rented any rooms at the prices it charged had it informed guests that the risk of being bitten by bedbugs was appreciable. Its failure either to warn guests or to take effective measures to eliminate the bedbugs amounted to fraud and probably to battery as well (compare *Campbell v. A.C. Equipment Services Corp.*, 610 N.E.2d 745, 748-49 (Ill. App. 1993); see *Restatement (Second) of Torts, supra*, § 18, comment c and e), as in the famous case of *Garratt v. Dailey*, 279 P.2d 1091, 1093-94 (1955), appeal after remand, 304 P.2d 681 (Wash. 1956), which held that the defendant would be guilty of battery if he knew with substantial certainty that when he moved a chair the plaintiff would try to sit down where the chair had been and would land on the floor instead. See also *Massachusetts v. Stratton*, 114 Mass. 303 (Mass. 1873). There was, in short, sufficient evidence of "willful and wanton conduct" within the meaning that the Illinois courts assign to the term to permit an award of punitive damages in this case.

But in what amount? In arguing that $20,000 was the maximum amount of punitive damages that a jury could constitutionally have awarded each plaintiff, the defendant points to the U.S. Supreme Court's recent statement that "few awards [of punitive damages] exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mutual Automobile Ins. Co. v. Campbell*, 123 S. Ct. 1513, 1524 (2003). The Court went on to suggest that "four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.*, citing *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991), and *BMW of North American, Inc. v. Gore*, 517 U.S. 559, 581 (1996). Hence the defendant's proposed ceiling in this case of $20,000, four times the compensatory damages awarded to each plaintiff.

The ratio of punitive to compensatory damages determined by the jury was, in contrast, 37.2 to 1.

The Supreme Court did not, however, lay down a 4-to-1 or single-digit-ratio rule—it said merely that "there is a presumption against an award that has a 145-to-1 ratio," *State Farm Mutual Automobile Ins. Co. v. Campbell, supra,* 123 S. Ct. at 1524—and it would be unreasonable to do so. We must consider why punitive damages are awarded and why the Court has decided that due process requires that such awards be limited. The second question is easier to answer than the first. The term "punitive damages" implies punishment, and a standard principle of penal theory is that "the punishment should fit the crime" in the sense of being proportional to the wrongfulness of the defendant's action, though the principle is modified when the probability of detection is very low (a familiar example is the heavy fines for littering) or the crime is potentially lucrative (as in the case of trafficking in illegal drugs). Hence, with these qualifications, which in fact will figure in our analysis of this case, punitive damages should be proportional to the wrongfulness of the defendant's actions.

Another penal precept is that a defendant should have reasonable notice of the sanction for unlawful acts, so that he can make a rational determination of how to act; and so there have to be reasonably clear standards for determining the amount of punitive damages for particular wrongs.

And a third precept, the core of the Aristotelian notion of corrective justice, and more broadly of the principle of the rule of law, is that sanctions should be based on the wrong done rather than on the status of the defendant; a person is punished for what he does, not for who he is, even if the who is a huge corporation.

What follows from these principles, however, is that punitive damages should be admeasured by standards or rules

rather than in a completely ad hoc manner, and this does not tell us what the maximum ratio of punitive to compensatory damages should be in a particular case. To determine that, we have to consider why punitive damages are awarded in the first place. See *Kemezy v. Peters*, 79 F.3d 33, 34-35 (7th Cir. 1996).

England's common law courts first confirmed their authority to award punitive damages in the eighteenth century, see Dorsey D. Ellis, Jr., "Fairness and Efficiency in the Law of Punitive Damages," 56 *S. Cal. L. Rev.* 1, 12-20 (1982), at a time when the institutional structure of criminal law enforcement was primitive and it made sense to leave certain minor crimes to be dealt with by the civil law. And still today one function of punitive-damages awards is to relieve the pressures on an overloaded system of criminal justice by providing a civil alternative to criminal prosecution of minor crimes. An example is deliberately spitting in a person's face, a criminal assault but because minor readily deterrable by the levying of what amounts to a civil fine through a suit for damages for the tort of battery. Compensatory damages would not do the trick in such a case, and this for three reasons: because they are difficult to determine in the case of acts that inflict largely dignatory harms; because in the spitting case they would be too slight to give the victim an incentive to sue, and he might decide instead to respond with violence—and an age-old purpose of the law of torts is to provide a substitute for violent retaliation against wrongful injury—and because to limit the plaintiff to compensatory damages would enable the defendant to commit the offensive act with impunity provided that he was willing to pay, and again there would be a danger that his act would incite a breach of the peace by his victim.

When punitive damages are sought for billion-dollar oil spills and other huge economic injuries, the considerations

that we have just canvassed fade. As the Court emphasized in *Campbell*, the fact that the plaintiffs in that case had been awarded very substantial compensatory damages—$1 million for a dispute over insurance coverage—greatly reduced the need for giving them a huge award of punitive damages ($145 million) as well in order to provide an effective remedy. Our case is closer to the spitting case. The defendant's behavior was outrageous but the compensable harm done was slight and at the same time difficult to quantify because a large element of it was emotional. And the defendant may well have profited from its misconduct because by concealing the infestation it was able to keep renting rooms. Refunds were frequent but may have cost less than the cost of closing the hotel for a thorough fumigation. The hotel's attempt to pass off the bedbugs as ticks, which some guests might ignorantly have thought less unhealthful, may have postponed the instituting of litigation to rectify the hotel's misconduct. The award of punitive damages in this case thus serves the additional purpose of limiting the defendant's ability to profit from its fraud by escaping detection and (private) prosecution. If a tortfeasor is "caught" only half the time he commits torts, then when he is caught he should be punished twice as heavily in order to make up for the times he gets away.

Finally, if the total stakes in the case were capped at $50,000 (2 x [$5,000 + $20,000]), the plaintiffs might well have had difficulty financing this lawsuit. It is here that the defendant's aggregate net worth of $1.6 billion becomes relevant. A defendant's wealth is not a sufficient basis for awarding punitive damages. *State Farm Mutual Automobile Ins. Co. v. Campbell, supra*, 123 S.Ct. at 1525; *BMW of North America, Inc. v. Gore, supra*, 517 U.S. at 591 (concurring opinion); *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 508-09 (7th Cir. 1992). That would be discriminatory and would violate the rule of law, as we explained earlier, by making

punishment depend on status rather than conduct. Where wealth in the sense of resources enters is in enabling the defendant to mount an extremely aggressive defense against suits such as this and by doing so to make litigating against it very costly, which in turn may make it difficult for the plaintiffs to find a lawyer willing to handle their case, involving as it does only modest stakes, for the usual 33-40 percent contingent fee.

In other words, the defendant is investing in developing a reputation intended to deter plaintiffs. It is difficult otherwise to explain the great stubborness with which it has defended this case, making a host of frivolous evidentiary arguments despite the very modest stakes even when the punitive damages awarded by the jury are included.

As a detail (the parties having made nothing of the point), we note that "net worth" is not the correct measure of a corporation's resources. It is an accounting artifact that reflects the allocation of ownership between equity and debt claimants. A firm financed largely by equity investors has a large "net worth" (= the value of the equity claims), while the identical firm financed largely by debt may have only a small net worth because accountants treat debt as a liability.

All things considered, we cannot say that the award of punitive damages was excessive, albeit the precise number chosen by the jury was arbitrary. It is probably not a coincidence that $5,000 + $186,000 = $191,000/191 = $1,000: i.e., $1,000 per room in the hotel. But as there are no punitive-damages guidelines, corresponding to the federal and state sentencing guidelines, it is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary. (Which is perhaps why the plaintiffs' lawyer did not suggest a number to the jury.) The judicial function is to police a range, not a point. See *BMW of North America, Inc. v. Gore, supra*, 517 U.S. at 582-83; *TXO*

*Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 458 (1993) (plurality opinion).

But it would have been helpful had the parties presented evidence concerning the regulatory or criminal penalties to which the defendant exposed itself by deliberately exposing its customers to a substantial risk of being bitten by bedbugs. That is an inquiry recommended by the Supreme Court. See *State Farm Mutual Automobile Ins. Co. v. Campbell, supra,* 123 S.Ct. at 1520, 1526; *BMW of North America, Inc. v. Gore, supra,* 517 U.S. at 583-85. But we do not think its omission invalidates the award. We can take judicial notice that deliberate exposure of hotel guests to the health risks created by insect infestations exposes the hotel's owner to sanctions under Illinois and Chicago law that in the aggregate are comparable in severity to that of the punitive damage award in this case.

"A person who causes bodily harm to or endangers the bodily safety of an individual by any means, commits reckless conduct if he performs recklessly the acts which cause the harm or endanger safety, whether they otherwise are lawful or unlawful." 720 ILCS 5/12-5(a). This is a misdemeanor, punishable by up to a year's imprisonment or a fine of $2,500, or both. 720 ILCS 5/12-5(b); 730 ILCS 5/5-8-3(a)(1), 5/5-9-1(a)(2). (For the application of the reckless-conduct criminal statute to corporate officials, see *Illinois v. Chicago Magnet Wire Corp.,* 534 N.E.2d 962, 963 (Ill. 1989).) Of course a corporation cannot be sent to prison, and $2,500 is obviously much less than the $186,000 awarded to each plaintiff in this case as punitive damages. But this is just the beginning. For, what is much more important, a Chicago hotel that permits unsanitary conditions to exist is subject to revocation of its license, without which it cannot operate. Chi. Munic. Code §§ 4-4-280, 4-208-020, 050, 060, 110. We are sure that the defendant would prefer to pay the

punitive damages assessed in this case than to lose its license.

                                        AFFIRMED.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*