2009 Ark. App. 513

**John J. BRONAKOWSKI and Judith C. Bronakowski, Appellants,**

v.

**John R. LINDHURST and Lisa Lindhurst, Appellees.**

**No. CA 08–1151.**

Court of Appeals of Arkansas.

June 24, 2009.

---

Davis Law Firm, by: Steven B. Davis, Harrison, for appellants.

The Law Offices of Christopher O'Hara Carter, P.A., by: Christopher O'Hara Carter, Yellville, for appellees.

KAREN R. BAKER, Judge.

Appellants, John and Judith Bronakowski, appeal from a Marion County jury award of punitive damages in the amount of $25,000 for the cutting of trees on John and Lisa Lindhursts' property. On appeal, the Bronakowskis assert that the trial court erred as a matter of law in denying their motion for judgment notwithstanding the verdict, remittitur, or a new trial. We disagree and affirm.

The parties stipulated to the following facts: that the Bronakowskis are the owners of Lot 74 in the Hillcrest Subdivision in Marion County, Arkansas, on the shore of Bull Shoals Lake; that the Lindhursts are the owners of Lot 75, also in Hillcrest Subdivision; that the Bronakowskis or their agents cut trees on the Lindhursts' property; and that $592.85 is the fair mar-ket value of the stumpage of the trees. The Lindhursts' permanent residence was near St. Louis, Missouri. When looking for a place to retire, the Lindhursts purchased Lot 75 in the Hillcrest Subdivision in October 1994. Mrs. Lindhurst explained that they purchased Lot 75 specifically because it was "totally wooded." They planned to build a home and retire to this property and had decided to build their retirement home in the middle of the lot, in the midst of the wooded area "where [they] would feel like [they] were in hundreds of acres." It was their goal to have complete privacy. When asked if they had ever cut any trees on the lot, Mrs. Lindhurst responded that they had not.

On October 8 or 9 of 2005, while at home in Missouri, Mrs. Lindhurst received a call from Larry and Joanne Carter, their neighbors in the Hillcrest Subdivision. The Carters called to inform the Lindhursts that the Bronakowskis had hired someone to clear Lot 75 and that this clearing was ongoing at that time. Mrs. Lindhurst immediately called Mr. Bronakowski. She testified that during this call Mr. Bronakowski "got angry" with her. During a second call Mr. Bronakowski did not give Mrs. Lindhurst an opportunity to resolve the matter; rather, during the conversation he told her to "sue [him]." When asked about the aerial photographs of Lot 74, Mrs. Lindhurst testified that on Lot 74, upon which the Bronakowskis planned to build a home, a lake view had "absolutely" been opened up.

After learning of the tree cutting and Ms. Lindhurst's telephone conversation with Mr. Bronakowski, the Lindhursts traveled to their property in order to view and evaluate the effect of the Bronakowskis' actions on Lot 75. She described what they discovered as "total destruction." She stated that "about a third of [the lot] on the Bronakowskis' side was

nothing but dirt." Mrs. Lindhurst identified some of the trees that had been removed as two feet in diameter and sixty feet tall. She expressed her opinion that those trees were irreplaceable in either her lifetime or her daughter's lifetime. Regarding the effect that the razing of the trees had on the valuation of her property, she testified Mr. Bronakowski's removal of the trees on their lot had caused the value of the land to them on a personal level to decrease. More specifically, she testified that the purpose behind the purchase of the land for a future retirement home no longer existed. She stated, "We had picked this piece of property as I had mentioned, as a totally wooded lot. That was the plan, that was our retirement plan where we have some privacy. That was taken away from us." She explained that she had searched with her husband for two years for a replacement piece of property, but they had not been successful in finding such a property. It was her belief that the Bronakowskis' actions were intentional, as the Corps of Engineers white line markers were clear and not easily missed. In her opinion, not only had the Bronakowskis' actions destroyed the aesthetic quality and diminished the value of the land to them, but it had also destroyed her and Mr. Lindhurst's expectations that they could live out their retirement years peacefully on Lot 75. Mrs. Lindhurst felt that under the circumstances, they were unable to enjoy their property with the company of the Bronakowskis as neighbors. As a result, they planned to sell Lot 75.

Larry Carter testified that he lived in Springfield, Missouri, and also had a home neighboring the Lindhursts' property in the Hillcrest Subdivision. Mr. Carter was familiar with the history of the Hillcrest Subdivision, as he had owned property there since 1968. He testified that the Childers, neighbors of the Carters, sold their Hillcrest property to the Bronakowskis. Mr. Carter was familiar with the property as he had visited the Childers when they lived there. Carter testified that there was no view of the lake from the Childers' front porch. It was during negotiations between the Childers and the Bronakowskis that Mr. Carter met the Bronakowskis.

At one point, the Carters owned Lot 73, next to Lot 74, which the Bronakowskis now owned. The Carters had Lot 73 surveyed at the time of purchase and again when they sold the property. When the second survey was complete, Mr. Bronakowski and Mr. Carter discussed the location of the corner of Lots 73 and 74, the fact that the survey pin was clearly visible from the road, and the fact that the Corps of Engineers corner was clearly marked. Lots 74 and 75 were both 220 feet wide along the Corps of Engineers white line.

Because the Carters owned the lot across the road from the Lindhursts' lot, Mr. Carter testified that he was interested in purchasing Lot 75 from the Lindhursts. Around October 2005, after the Bronakowskis cut the trees on Lot 75, Mr. Carter contacted the Lindhursts and expressed his desire to purchase Lot 75. Mr. Carter prefaced his offer with the fact that despite his interest in the lot, he did not want to get involved in a property dispute or a lawsuit. When asked if the removal of the trees on the Lindhurst property greatly improved the view of the lake from the house that the Bronakowskis lived in originally, Mr. Carter agreed that there was no question that it had. Moreover, Mr. Carter responded "yes" when asked if the clearing improved the view of the lake on Lot 74, where the Bronakowskis' current house was located. Mr. Carter stated that his opinion was based on his familiarity with the views from Lots 73, 74, and 75.

Mr. Carter testified that his relationship with the Bronakowskis changed following an incident around Thanksgiving 2006. That Thanksgiving weekend, as Mr. Carter and his wife were walking along McBride Road, they heard a car coming from behind them accelerating as it came toward them. The Carters moved quickly toward the ditch. When Mr. Carter turned around, he saw that the driver of the accelerating vehicle was Mr. Bronakowski. Mr. Carter explained that Mr. Bronakowski came so close to him with his car that if he "had stuck [his] hand out [he] would have lost [his] hand and broken [his] arm." Mr. Bronakowski and Mr. Carter had not spoken since this incident.

David Swyhart testified that he also lived in the Hillcrest Subdivision. He explained that he met Mr. Lindhurst twelve to fourteen years ago. Swyhart testified that he could see the Lindhursts' property from his front porch and that he was aware of where the boundaries of most of the lots were located. He first met the Bronakowskis eight or nine years prior to the trial. He and Mr. Bronakowski played cards, fished, played golf, and cooked out together. He explained that before purchasing Lot 74, the Bronakowskis lived in a house on Lots 67 and 68. He agreed that he and Mr. Bronakowski spent a lot of time together. Mr. Swyhart related an incident that occurred when they were sitting on the porch of the Bronakowskis' home on Lots 67 and 68. Mr. Swyhart testified that he had teased Mr. Bronakowski about having "the prettiest view of 3 mail boxes [he] had ever seen." It was because the "whole side of the road from the resort property clear up to Vance road [was] all timber" that Mr. Swyhart had encouraged the Bronakowskis to buy Lot 74. Mr. Swyhart testified that he and the Bronakowskis walked the boundaries of Lot 74 together, and that together they identified where the survey pins were lo-

cated. There was no question in Mr. Swyhart's mind that the Bronakowskis knew where the survey pins for Lot 74 were located.

Eventually, the Bronakowskis did buy Lot 74. Mr. Swyhart testified that he and Mr. Bronakowski did some clearing on Lot 74 and that they cleared trees across the line onto the Lindhursts' property. Their goal was to try and get a lake view for the Bronakowskis; however, their efforts were rather unsuccessful. Afterwards, while visiting on the front porch, Mr. Bronakowski told Mr. Swyhart that he had "knocked out a few more trees." Mr. Swyhart knew that the trees Mr. Bronakowski referred to were those located on the Lindhursts' property. When asked if there were any other occasions when Mr. Bronakowski told Swyhart about removing more trees, Swyhart responded, "I don't know if it ever came up again.... I think it might have."

Mr. Swyhart testified that in October 2005, he saw the bulldozers on the Lindhursts' property, which was when Mr. Swyhart learned that the Bronakowskis were building a new home. Mrs. Lindhurst, in fact, called Mr. Swyhart to "ask what was going on" on her property. Mr. Swyhart testified that he told Ms. Lindhurst to call Mr. Bronakowski about it. She did. During the call, she advised Mr. Bronakowski to "stay off [her] property." Mr. Swyhart testified that within a day or so, he heard the bulldozers again. When he approached one of the workers and gave him the phone with Mrs. Lindhurst on the line, the worker informed her that he had been instructed to clean up the Lindhursts' property. Mr. Swyhart testified that the Bronakowskis had not spoken to him or to his wife in the past three years. The Bronakowskis had ceased speaking to the Swyharts following a disagreement between Mr. Bronakowski and

Mr. Swyhart's brother. However, Mr. Swyhart testified that in November of 2005, Mr. Bronakowski approached Swyhart in Swyhart's yard, and "he slid to a stop, jumped out of his car, waiving a piece of paper and started threatening [Mr. Swyhart] and telling [Mr. Swyhart] to "stay out of his G* *d* * *ed business." Mr. Bronakowski left Swyhart's property that day. Mr. Swyhart testified that subsequently, on several occasions, Mr. Bronakowski would try to "veer over in [his] lane" to try and run him off the road. As a result, Mr. Swyhart filed a formal complaint at the sheriff's office against the Bronakowskis. Mr. Swyhart testified that he would agree with the letter from Mark Cutrer of the Arkansas Forestry Commission that four tenths of an acre of the Lindhursts' timber acreage was gone; however, he did not agree that the value of the timber cut was only $592.85. He further testified that he was certain that the Bronakowskis knew that they were cutting trees on the Lindhursts' property.

Mr. Lindhurst testified that when visiting his property in 2003, he noticed that the tops of some trees had been cut and grass clippings had been dumped on his property. At that point, he told the Bronakowskis to stay off of his property. In October 2005, he and Mr. Bronakowski had what he described as a heated conversation, during which Mr. Lindhurst again told Mr. Bronakowski to stay off of his property. When Mr. Lindhurst arrived on the property after learning of the 2005 tree cutting, he discovered "[a] lot of devastation." He took measures such as taping off the property with caution tape and taking numerous photographs. He testified that he had not given anyone permission to clear any of the timber from his property. He stated that not all of the property had been cleared at once by the bulldozers. It appeared to him that the clearing had been "done a little at a time, methodically."

Mr. Bronakowski testified that he and his wife purchased their house on Lots 67 and 68 in the Hillcrest Subdivision for $102,000 in 2000 or 2001. They sold the house on Lots 67 and 68 in September 2007 (two months prior to the trial) for $175,000. He testified that he put $40,000 into the house on Lots 67 and 68, but admitted to making a profit of $30,000[1] on the sale over and above the cost of the improvements he claimed. In 2002 or 2003, the Bronakowskis purchased Lot 74, which was located between Lots 67 and 68 and the waterfront. He testified that when he purchased Lot 74, it had nothing to do with getting a better view for the house that sat on Lot 67 and 68. He testified that in 2003, he and other persons cleared an area of land along the road. He testified that they all thought the land went straight down instead of at a curve. He admitted to mistakenly cutting down some of the Lindhursts' trees. He said that he apologized to Mr. Lindhurst after the incident and that Mr. Lindhurst responded, "no problem." He admitted that between that incident and October 2005, he cut down more trees before he had it surveyed. However, he later had Mr. Henderson survey Lot 74, and Mr. Henderson told Mr. Bronakowski that he was "in the wrong." Mr. Bronakowski admitted to cutting two big "trees at the bottom of the hill before [he] had it surveyed." He agreed that the forestry re-

---

1. In response to a question on direct-examination, Mr. Bronakowski admitted that he made a $30,000 profit on the sale of the house on Lots 67 and 68; however, the record reveals that Mr. Bronakowski also testified that he purchased the house on Lots 67 and 68 for $102,000, sold it for $175,000, and claimed improvements of $40,000, resulting in a profit of $33,000.

port showed that four-tenths of an acre had been cleared, which would be sixty feet over on the Lindhursts' property, but he denied that he removed the trees. Instead, he stated that Mr. Swyhart and his friends were the people that had cleared that portion of the Lindhursts' property. And, all he did "was burn." He stated that he did not touch the property after the survey was complete and that he was sorry that he cut the trees down. Mr. Bronakowski testified that he was unaware of the location of the survey markers at the bottom of the property until the surveyor placed them there at the time of his survey. He also testified that he was unsure of where his property cornered with the Corps of Engineers' property. He disputed that Mr. Swyhart ever showed him any survey markers at the bottom of the property. When asked if in his opinion he owed the Lindhursts anything for the destruction of the trees on their property, he responded, "Not a thing."

Judith Bronakowski testified that in 2004—prior to clearing the land on Lot 74 to build their house—Mr. Swyhart had organized clearing on Lot 74 with his friends and family members. She also testified that she and Mr. Bronakowski decided to build a home on Lot 74 in the summer of 2005. She admitted that they did not have a survey done before clearing the land. After she and Mr. Bronakowski cleared trees from the Lindhursts' property in 2005, she received a message that Mrs. Lindhurst had tried to fax her at work when she was out of town. Mrs. Bronakowski returned Mrs. Lindhurst's call, and she stated that the first couple of conversations she had with Mrs. Lindhurst were amicable. She told Mrs. Lindhurst that they planned to have a survey done. After the survey was concluded, the next telephone call between Mr. Bronakowski and the Lindhursts was less than amicable. She stated that she and Mr. Bronakowski were "astonished" when they saw the survey and realized the extent of their encroachment on the Lindhursts' property. She admitted that she and Mr. Bronakowski were not happy with their view of the lake from Lots 67 and 68, which was why they purchased Lot 74.

At the conclusion of the testimony and evidence, the jury after deliberation returned with a verdict in favor of the Lindhursts. The jury awarded $592.85 in compensatory damages and $25,000 in punitive damages. The Bronakowskis filed a motion for judgment notwithstanding the verdict or alternatively for remittitur or a new trial. Their motion was deemed denied. This appeal followed.

I. *Insufficient Evidence To Support the Punitive Damages Award*

On appeal, the Bronakowskis first contend that there was insufficient evidence to support an award of punitive damages. At the close of the Lindhursts' case, counsel for the Bronakowskis made a motion for a directed verdict. In that motion he stated:

I need to make a motion now. Judge for purposes of making a record I need to make a directive verdict motion on punitive damages of plaintiff's complaint. The plaintiffs haven't set forth a lick of proof to show some sort of conspiracy, plan, anything along those lines that my client has been acting in a way punitive damages are appropriate or be obtained. My client silently fell in these trees when no one else to know about it and in order to make something work here they just haven't met their burden of proof and the Courts directive on the punitive damage portion of this complaint.

The trial court denied the motion, stating that "There's enough for the jury to decide." Counsel for the Bronakowskis,

however, failed to renew the motion for a directed verdict at the close of the evidence. In *Superior Federal Bank v. Mackey*, 84 Ark.App. 1, 20, 129 S.W.3d 324, 336 (2003), this court held:

> The supreme court has also recently held that an appellant waives its right to question the sufficiency of the evidence to support a punitive-damage award if it does not make the proper directed-verdict motions. *Advocat, Inc. v. Sauer*, 353 Ark. 29, 49, 111 S.W.3d 346, 357 (2003):
>
> > Appellants' first argument that there was insufficient evidence to support the award of punitive damages in this case is not preserved for this court's review. Arkansas Rule of Civil Procedure 50(e) requires that where "there has been a trial by jury, the failure of a party to move for a directed verdict at the conclusion of all the evidence, because of insufficiency of the evidence will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the jury verdict."
>
> .   .   .   .   .
>
> Because the appellants failed to renew their motion for directed verdict following the conclusion of the Sauer Estate's rebuttal, they waived any question pertaining to the sufficiency of the evidence to support the jury's award of punitive damages.

*See also Prendergast v. Craft*, 102 Ark. App. 237, 284 S.W.3d 104 (2008) (finding that Prendergast was procedurally barred from raising the issue of sufficiency of the evidence to support a jury award for punitive damages where Prendergast made no directed-verdict motion on the claim for punitive damages, nor did he object to the jury being instructed on punitive damages). Because the Bronakowskis failed to renew their motion for a directed verdict

at the close of the evidence, they waived any challenge to the sufficiency of the evidence. However, had they properly preserved this issue for our review we note that sufficient evidence supported the trial court's decision to submit the issue of punitive [12]damages to the jury. Certainly, the jury could and did find from the testimony presented that the Bronakowskis intentionally cut trees from and caused the clearing of the Lindhursts' property in order to obtain a view from their lots to the lake. Additionally, the evidence supports the conclusion that the Bronakowskis undertook these actions despite being repeatedly warned to stay off of the Lindhursts' property and that they ultimately profited from their wrongful actions.

II. *Punitive Damages Award Was Excessive Under State Law and the Standards Set Forth by the Supreme Court in Gore*

Second, the Bronakowskis assert that the punitive-damages award was excessive under state law and violated their due process rights as established by *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

■ Under state law, when considering the issue of remittitur, we follow this standard of review:

> When considering the issue of remittitur of punitive damages, we review the issue *de novo*. *See Smith v. Hansen*, 323 Ark. 188, 914 S.W.2d 285 (1996). We consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. *See United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998); *McLaughlin v. Cox*, 324 Ark. 361, 922 S.W.2d 327 (1996). Punitive damages are a penalty for conduct that is mali-

cious or perpetrated with the deliberate intent to injure another. *See United Ins. Co., supra.* When punitive damages are alleged to be excessive, we review the proof and all reasonable inferences in the light most favorable to the appellees, and we determine whether the verdict is so great as to shock the conscience of this court or to demonstrate passion or prejudice on the part of the trier of fact. *See Houston v. Knoedl,* 329 Ark. 91, 947 S.W.2d 745 (1997); *Collins v. Hinton,* 327 Ark. 159, 937 S.W.2d 164 (1997). It is important that the punitive damages be sufficient to deter others from comparable conduct in the future. *See McLaughlin v. Cox, supra.*

*Routh Wrecker Service, Inc. v. Washington,* 335 Ark. 232, 240–41, 980 S.W.2d 240, 244 (1998).

Here, the jury could have concluded that the Bronakowskis knowingly cleared four-tenths of an acre of the Lindhursts' lot. The testimony supports the conclusion that the Bronakowskis knew the location of the property boundaries and corners and that the survey pin and the Corps of Engineers markers were clear and visible. There was also testimony that there was no clear view of the lake from the Bronakowskis' lots before they cleared the Lindhursts' property. The removal of the trees from the Lindhursts' lot improved the view of the lake not only from the house that the Bronakowskis lived in at that time, but also greatly improved the view of the lake from the house where the

Bronakowskis currently live. Mr. Bronakowski admitted at trial that he cut down trees on the Lindhursts' property. Mrs. Bronakowski admitted that they sold Lots 67 and 68 and bought Lot 74 because they were unhappy with the view they had of the lake. In addition to the improved view of the lake that the Bronakowskis enjoy from their new home, the jury could have concluded that the $30,000 profit, over and above the cost of improvements to the property, realized by the Bronakowskis on the sale of their home on Lots 67 and 68 was a direct result of their intentional wrongful clearing of the Lindhursts' property.[2] In light of these facts, we conclude that the verdict granting the Lindhursts punitive damages of $25,000 is not so great as to shock the conscience of the court. In fact, we find it is impossible to say that an award of punitive damages, which the jury could have concluded was at least $5,000 less than the profit gained by the tortfeasors in committing the wrong, exceeds what is necessary to sufficiently deter others from comparable conduct in the future.

The Bronakowskis next assert that the award was in excess of the due process standards established by *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In *Gore,* the United States Supreme Court held that the due process clause of the Fourteenth Amendment prohibits a state from imposing grossly excessive punishment on a tortfeasor. *Routh Wrecker Service,* 335 Ark. at 242, 980 S.W.2d at 245

---

**2.** The concurring opinion notes that no one testified that the $30,000 profit that the Bronakowskis gained on the sale of their home was *wholly* attributable to the view and that property values tend to increase over time. While true, this observation overlooks the fact that the Bronakowskis actually received $73,000 more than they paid for their home (after putting $40,000.00 into it—per Mr. Bro-

nakowski's testimony, which the jury was not required to believe). Property values do tend to go up, but rarely does anyone recoup one hundred percent of the cost of improvements to an existing home. We find only that the jury could have concluded, on the evidence before it, that the additional $30,000 resulted from the Bronakowskis' conduct.

(citing *Gore*, 517 U.S. at 582, 116 S.Ct. 1589). In *Gore*, "[t]he Court set out three guidelines for determining when an award would violate due process: (1) the degree of reprehensibility of the defendant's conduct, (2) the award's ratio to the actual harm inflicted on the plaintiff, and (3) a comparison of the punitive damages to the civil or criminal penalties that could be imposed for comparable conduct. The Court said that there was no mathematical bright line for determining gross excessiveness and that 'low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.'" *Routh Wrecker, supra* (quoting *Gore*).

The first guideline we consider is the degree of reprehensibility. In considering the degree of reprehensibility, the United States Supreme Court has expanded on the factors to be considered: whether the harm caused was physical as opposed to economic; whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; whether the target of the conduct was financially vulnerable; whether the target of the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *See Mackey*, 84 Ark.App. at 21, 129 S.W.3d at 337 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

It is certain that the Lindhursts suffered economic harm; however, the harm done here was not purely economic. The Lindhursts stipulated that the value of the trees, or stumpage, was $592.85, and this is the amount of compensatory damages they were awarded by the jury. In other words, had the Lindhursts decided to sell the trees for timber they could have expected to received $592.85 for the logs. When assessing the harm they have incurred the jury could take into account that some of the trees were sixty feet tall, and impossible to replace. Likewise they could take into account that clearing almost one half of the property of all vegetation rendered the Lindhursts' desired use of the property (as a wooded setting for a future retirement home) impossible.

We acknowledge that the harm caused to the Lindhursts did not constitute bodily injury; we nevertheless conclude that the harm done here was much more than purely economic injury. The Bronakowskis, on more than one occasion, entered the Lindhursts' property and cleared, down to the dirt, approximately forty percent of the Lindhursts' future retirement homesite. The Lindhursts testified that, given their intended use of the property, the privacy afforded by the trees on the lot was very important to them. In fact, they had never removed a tree from the lot; rather, they had planted additional trees. Some trees removed by Mr. Bronakowski were two feet in diameter and sixty feet tall; the value of these trees to the Lindhursts could not be calculated in terms of boardfeet. They were irreplaceable to the Lindhursts for precisely the same reason the trees were annoying to the Bronakowskis—because they were blocking the neighbors' view. The Bronakowskis' actions forced the Lindhursts to give up their plans to retire to the property and ultimately to sell it.

Additionally, the tree cutting was not an isolated incident. Mr. Swyhart's testimony supports the conclusion that on at least two other occasions the Bronakowskis knowingly cut trees on the Lindhursts' property in order to improve their view. Mr. Lindhurst confirmed that there was an occasion, prior to October 2005, when he

noticed that the tops of some of his trees had been cut and grass clippings had been dumped on his lot. He then told the Bronakowskis to stay off of his property. They did not. The record demonstrates that some clearing had been done a little at a time over a period of several years. In October of 2005 the Bronakowskis once again failed to heed the Lindhursts' warning to stay off their property. Instead, Mr. Bronakowski told Mrs. Lindhurst to "sue [him]," and within a couple of days, the bulldozers were back on the Lindhursts' property and the clearing continued.

Finally, there was testimony that the tree cutting was intentional and a result of malice on the part of the Bronakowskis and was not merely an accident. More than one witness testified that the Corps of Engineers markers were clearly marked. Testimony showed that Lot 74 had been previously surveyed by the Carters and that the Bronakowskis were aware of the location of the corner of Lot 74. Mr. Bronakowski admitted to cutting down trees on the Lindhursts' lot in 2003. He also admitted that between the 2003 incident and October 2005, he cut down yet more trees on the Lindhursts' property. Furthermore, the Lindhursts were absentee landowners and as such were particularly vulnerable to the Bronakowskis' systematic assault on their property. They did not witness the cutting of their trees and were powerless to prevent it. They could only seek redress after the fact.

There was evidence that prior to October 2005, the Bronakowski Lots 67 and 68 had no view of the lake. Mrs. Bronakowski admitted that they purchased Lot 74, which was in direct line with the lake from Lots 67 and 68, because they were not happy with their view of the lake from Lots 67 and 68. The jury could conclude from the evidence that the $30,000 profit the Bronakowskis received from the sale of Lots 67 and 68 was a direct result of the tree clearing on the Lindhursts' property. It is well settled that no sane person should be permitted to profit by his own wrong or criminal acts. *See Wright v. Wright,* 248 Ark. 105, 449 S.W.2d 952 (1970) (stating that in an action to quiet title to lands, where the first of two sons murdered the father and mother, title of all lands of father and mother who were murdered vested in son who did not murder them); *see also Middleton v. Lockhart,* 344 Ark. 572, 43 S.W.3d 113 (2001) (stating that it is a familiar principle of law that one who wrongfully kills another is not permitted to share in the other's estate, to collect his life insurance, or otherwise profit by the crime; one who wrongfully kills will not be allowed to profit by it).

Generally, the law regards real property as unique. *See generally Shelton v. Keller,* 24 Ark.App. 68, 748 S.W.2d 153 (1988); *see also Arkansas State Highway Commission v. Sargent,* 241 Ark. 783, 791, 410 S.W.2d 381, 386 (1967) (stating that "in considering testimony based on comparable sales, it must be remembered that no two tracts of real estate are identical" and that "[r]easonable latitude must be allowed in evaluating sales and adjusting or compensating for differences in similar lands"). The property at issue here was unique and distinct lakefront property. The Lindhursts intended to use this property for a retirement home, and the Bronakowskis' conduct rendered it unsuitable to the Lindhursts for that purpose.

The second guideline to consider is the ratio of the award to the actual harm inflicted on the Lindhursts. "Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award." *Gore,* 517

U.S. at 582, 116 S.Ct. 1589 (citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. *Id.* A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. *Id.* In *Gore,* the Court noted that in most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. *Id.* at 583, 116 S.Ct. 1589. While we acknowledge that the Supreme Court has noted that few awards exceeding a single-digit ratio would satisfy due process, *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), "we have approved ratios greater than a single digit" in certain cases. *See Jim Ray, Inc. v. Williams,* 99 Ark.App. 315, 260 S.W.3d 307 (2007) (acknowledging this court's approval of ratios greater than a single digit in cases of extreme emotional distress or humiliation, a significant disparity of bargaining power, ongoing racial animus that destroyed a business, and a "nightmarish" situation involving an improper arrest). *See, e.g., Routh Wrecker Serv.,* 335 Ark. at 241–42, 980 S.W.2d at 244–45 (1998); *Aon Risk Serv. v. Mickles,* 96 Ark.App. 369, 379, 242 S.W.3d 286, 294 (2006); *Superior Federal Bank v. Jones & Mackey Constr. Co., LLC,* 93 Ark.App. 317, 330, 219 S.W.3d 643, 653 (2005).

The award must, however, "be based on the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. Furthermore, not only did the Bronakowskis knowingly remove trees from the Lindhursts' lakefront property, the removal of these trees greatly benefitted the Bronakowskis by providing a view of the lake on Lots 67, 68, and 74. This allowed them to profit from the view on the sale of Lots 67 and 68 while still enjoying the view from Lot 74; the timber cut is irreplaceable in the parties' lifetimes; and the purpose behind the Lindhursts' purchase of this retirement property is thwarted. Under these facts, the $25,000 award of punitive damages is not breathtaking, nor does it "raise a suspicious judicial eyebrow," *see Gore,* 517 U.S. at 583, 116 S.Ct. 1589. We conclude that the award is not so grossly excessive as to violate due process.

The third guidepost in *Gore* is the disparity between the punitive damages award and the civil or criminal penalties authorized or imposed in comparable cases. *See Union Pacific R.R. Co. v. Barber,* 356 Ark. 268, 149 S.W.3d 325 (2004). These comparable sanctions represent the notice component in our due-process review. *Jim Ray, Inc.,* 99 Ark.App. at 324, 260 S.W.3d at 312 (citing *Superior Federal,* 93 Ark.App. at 330, 219 S.W.3d at 653). In this case, when the punitive damages are compared to the civil or criminal penalties that could be imposed for comparable conduct, the ratio of punitive damages to compensatory damages becomes less significant. The most severe criminal charge the Bronakowskis could face for their conduct is, they concede, criminal mischief in the first degree under Arkansas Code Annotated section 5–38–203 (Repl.2006). The Bronakowskis further admit that if the amount of actual damages is more than $500, as was stipulated in this case, then criminal mischief in the first degree can be a Class C felony. *See* Ark.Code Ann. § 5–38–203(b)(1). The maximum fine for a Class C felony is $10,000. *See* Ark.Code Ann. § 5–4–201(a)(2) (Supp.2007). Each of

the Bronakowskis could have been charged with a Class C felony and with a potential fine of $10,000 for the cutting of the trees in the most recent incident.[3] Moreover, the Bronakowskis concede that Arkansas Code Annotated section 15–32–101(a)(1) and (2) (Repl.2003) requires that any person who desires to cut and remove any timber shall cause the land to be surveyed and marked or rely in good faith on an existing marked line or established corner. A violation of this provision is a misdemeanor, and the person shall be fined, for each offense, in any sum not less than $25 nor more than $300, and may be imprisoned in the county jail not more than six months. Ark.Code Ann. § 15–32–101(d). Moreover, the testimony reveals at least three incidents since 2003. While the Bronakowskis did not stipulate to the specific amount of damages they caused during the earlier incidents, this is irrelevant to our review. The due process notice requirement is satisfied when, prior to engaging in the conduct, the *potential sanctions* are known.

In addition, Arkansas Code Annotated section 18–60–102(a)(1) (Repl.2003) provides treble damages to be paid by any person who trespasses and cuts down, injures, destroys, or carries away any tree placed or growing for use or shade or any timber standing or growing on the land of another person. We conclude that the Bronakowskis had ample notice that their actions could result in a penalty of $25,000 punitive damages.

For the foregoing reasons, we hold that the trial court did not err in denying the Bronakowskis' motion for judgment notwithstanding the verdict, a new trial, or remittitur.

Affirmed.

VAUGHT, C.J., agrees.

MARSHALL, J., concurs.

D.P. MARSHALL JR., Judge, concurring.

I concur in our judgment affirming the punitive damages awarded. But I do not join the court's opinion because I part company with my colleagues on some of the analysis.

1. On the sufficiency of the evidence supporting punitive damages, I agree that the Bronakowskis waived this point by failing to seek a directed verdict at the close of all the evidence. If we could reach the merits, the evidence was more than sufficient to go to the jury.

2. On excessiveness under state law, the punitives verdict passes muster for the reasons stated by the court with one exception. The record contains no evidence that the Bronakowskis' $30,000.00 profit from the sale of their home on Lots 67 and 68 was *wholly* attributable to the lake view they secured by clearing about one third of the Lindhursts' lot. No one testified about the dollar value of a lake view. It is a reasonable inference from the proof that some of the Bronakowskis' profit was attributable to the view. But real property

3. The concurrence takes issue with the conclusion that both the Bronakowskis had notice that they could each be subject to criminal penalties. Clearly, Mr. Bronakowski was the principle trespasser. We do not suggest that the proof established that Mrs. Bronakowski was an accomplice beyond a reasonable doubt. This is not a criminal case. However, the facts that the clearing took place over a period of years, that the Bronakowskis ultimately hired a bulldozer operator to clear a more substantial portion of the lot that the bulldozer continued the clearing after Mrs. Bronakowski's telephone discussion with Mrs. Lindhurst is certainly suggestive of joint participation. We hold only that both of the Bronakowskis were on notice that they could be subject to the applicable criminal penalties.

values (usually) tend to increase over time—as demonstrated by the $23,000.00 profit that the Lindhursts were under contract to make on their lot even after Mr. Bronakowski's clearing. After considering all material facts in favor of the Lindhursts under the governing state law, however, the punitive damages do not shock my conscience or demonstrate a jury driven by passion or prejudice. *Routh Wrecker Service, Inc. v. Washington,* 335 Ark. 232, 240–41, 980 S.W.2d 240, 244 (1998).

3. On the federal due-process question, the award is at the constitutional line but—applying the three familiar guideposts—not over it. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Jim Ray, Inc. v. Williams,* 99 Ark.App. 315, 321, 260 S.W.3d 307, 310 (2007). Our review is *de novo. Jim Ray,* 99 Ark.App. at 321, 260 S.W.3d at 310.

*Reprehensibility.* Mr. Bronakowski's repeated acts of cutting trees on the Lindhursts' lot, which culminated in a bulldozer scraping four-tenths of an acre down to the dirt, were in the middle range of reprehensible acts. This was not a routine commercial transaction polluted with trickery, the low end. *E.g., Jim Ray,* 99 Ark.App. at 321–23, 260 S.W.3d at 311. Nor was this a calculated decision to market a product that would hurt people, the high end. *E.g., Arrow Int'l, Inc. v. Sparks,* 81 Ark.App. 42, 55–56, 98 S.W.3d 48, 57–58 (2003). I agree with the court: as absentee landowners, the Lindhursts were vulnerable in a way that the law should recognize to the Bronakowskis' repeated trespasses. I agree that the harm done was more than purely economic: the Lindhursts' retirement plans were torpedoed. I agree too that the Bronakowskis profited from their wrong: they have a better lake view from their new home-

site; and by creating a lake view for their former home before selling it, they made more money than they otherwise would have.

Reprehensibility is the most important guidepost. *Jim Ray,* 99 Ark.App. at 322, 260 S.W.3d at 311. In light of our cases on the range of reprehensible conduct, and all the particulars here, Mr. Bronakowski's repeated and intentional clearing was of middling reprehensibility.

*Ratio.* The Bronakowskis make their strongest push on this guidepost. The ratio between the compensatory and punitive damages is huge. About 42 to 1—the greatest ratio (as far as I can tell) ever presented in an Arkansas case. Of course every punitive-damage award must be evaluated for constitutional reasonableness on its own facts. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 424–25, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). But this ratio must give pause.

We have before us, I conclude, the case that the Supreme Court has repeatedly hypothesized: small economic damages, coupled with hard to quantify noneconomic harm, caused by particularly egregious intentional acts. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513; *Gore,* 517 U.S. at 582, 116 S.Ct. 1589. Our court has also recognized that this kind of case might arise. *Jim Ray,* 99 Ark.App. at 323, 260 S.W.3d at 312. We relied in part in *Jim Ray* on a Seventh Circuit case that confronted a similar situation—*Mathias v. Accor Economy Lodging, Inc.,* 347 F.3d 672 (7th Cir. 2003). We should look again to that decision in evaluating this case.

*Mathias* is the bed bug case. A Chicago hotel decided that, instead of solving the infestation, it would simply ignore the bug problem, giving refunds and moving guests around when necessary. The jury awarded two guests $5,000.00 each in compensatory damages and $186,000.00 each

in punitive damages. 347 F.3d at 674. The ratio was more than 37 to 1. The Seventh Circuit approved this ratio, concluding that it was necessary to punish and deter the hotel and deter others. 347 F.3d at 676–77.

*Mathias*'s reasoning is persuasive here for three reasons. First, Mr. Bronakowski's "behavior was outrageous but the compensable harm done was slight and at the same time difficult to quantify because a large element of it was emotional." 347 F.3d at 677. The parties stipulated to the Lindhursts' loss in terms of lumber. But that modest amount—less than $600.00—does not reflect either the actual value of sixty-foot trees or the resulting loss of privacy and neighborhood harmony to which the Lindhursts were looking forward in retirement. Second, the law should not allow the Bronakowskis to profit from their wrong. 347 F.3d at 677. They got a better lake view for their new house and a lake view for their old one. The law should deter them, and others, from similar self help.

Third, we should recognize that, absent the possibility of substantial punitive damages, plaintiffs situated like the Lindhursts will have difficulty paying for cases like this one. The game would not be worth the candle if (as the Bronakowskis suggest) punitive damages were capped at a single-digit ratio, approximately $5,300.00. Paying counsel on an hourly basis would likely consume almost all the damages, compensatory and punitive, leaving little for the injured parties. As a contingency-fee matter, the numbers are not enticing either. Considered as a matter of deterrence, one of the twin guiding purposes of punitive damages, the economic realities of the litigation bear on what ratio comports with due process. *Mathias*, 347 F.3d at 677. When confronted with his wrongdoing, Mr. Bronakowski told Mrs.

Lindhurst "sue me." Without the prospect of punitive damages in the range awarded here, that retort will be a safe haven.

*Comparable Penalties.* My disagreement with the court is deepest on this guidepost. I agree with the Bronakowskis that the highest criminal penalty available in the circumstances was $10,000.00. This is the penalty for first degree criminal mischief as a Class C felony because actual damages exceeded $500.00. Ark.Code Ann. §§ 5–38–203(b)(1), 5–4–201(a)(2) (Repl.2006 & Supp.2007). I see no evidence of record, however, that Mrs. Bronakowski participated in planning these misdeeds or in clearing part of the Lindhursts' land. So there should be no stacking a potential second felony penalty for her. As the court notes, Mr. Bronakowski could also face a fine of up to $300.00 and imprisonment for up to six months for cutting timber without a survey. Ark.Code Ann. § 15–32–101(d) (Repl.2003). Imprisonment for what happened here, it seems to me, is unlikely. Finally, the General Assembly has fixed an amount three times the compensatory damages as the proper penalty in trespass/timber-cutting cases. Ark.Code Ann. § 18–60–102(a)(1) (Repl. 2003). We owe all these legislative judgments "substantial deference." *Gore,* 517 U.S. at 583, 116 S.Ct. 1589.

Beyond whether there was a second felony in prospect for Mrs. Bronakowski, I differ with the court on other points. The court speculates a bit by looking back to the prior instances of clearing. The record establishes that they happened, but it does not show the value of the timber cleared in those instances. We therefore cannot say with any certainty what amount of criminal penalties would apply beyond the modest fine of failing to survey before cutting. I am also unpersuaded by the court's observation that the mere potential

for "sanctions" satisfies the notice element of due process inherent in this guidepost. *Jim Ray,* 99 Ark.App. at 324, 260 S.W.3d at 312.

Considering all the statutes, I see the comparable civil and criminal penalties as about $12,000.00. This guidepost therefore favors reducing the punitive award.

On *de novo* review, we must evaluate the punitive damages through the guideposts for reasonableness to ensure that they are "based upon an application of law, rather than a decisionmaker's caprice." *Campbell,* 538 U.S. at 418, 123 S.Ct. 1513 (internal quotation omitted). We consider the analysis under all the guideposts. The reprehensibility of Mr. Bronakowski's conduct is "[p]erhaps the most important indicium of the reasonableness" of the award. *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. Mr. Bronakowski's repeated clearing was reprehensible. It was in the middle of the range of reprehensible acts illustrated by our cases. While the ratio guidepost seems to promise the greatest objectivity because it is a matter of numbers, the Court has repeatedly rejected the notion that a certain ratio will always offend the Constitution. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. This case demonstrates the wisdom of that flexible standard. A single-digit award would neither punish the Bronakowskis in an appropriate measure nor deter future similar misconduct by others. For the reasons articulated in *Mathias,* this kind of huge ratio is constitutionally permissible in this kind of small-dollar case. The comparable-penalties guidepost supports a substantial remittitur. It is, however, the least important guidepost. *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513. And we must evaluate the award by considering carefully all three guideposts as one whole.

The jury's punitive award is "strong medicine." *Gore,* 517 U.S. at 576–77, 116 S.Ct. 1589. But the egregiousness of Mr. Bronakowski's repeated conduct, coupled with our law's need to punish and deter similar conduct—especially when the compensatory damages are modest, convinces me that the $25,000.00 award is not grossly excessive. Our charge is "to police a constitutionally acceptable range, not a fixed point." *Jim Ray,* 99 Ark.App. at 321, 260 S.W.3d at 310–11. This award is at the far edge of the constitutionally acceptable range for this kind of case. But it is not so large that it "enter[s] the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Gore,* 517 U.S. at 568, 116 S.Ct. 1589.