HOLIDAY INN FRANCHISING, INC.,
now known as Holiday Hospitality
Franchising, Inc., Appellant

v.

HOTEL ASSOCIATES, INC., Appellee.

No. CA 10–21.

Court of Appeals of Arkansas.

Feb. 23, 2011.

Peter Gray Kumpe, Nathan M. Norton Jr., Jess Askew III, Jay Mark Davis, Gary D. Marts, Jr., Jamie Kel Fugitt, Little Rock, for appellant.

Timothy Oliver Dudley, Little Rock, for appellee.

RAYMOND R. ABRAMSON, Judge.

A Crittenden County jury awarded appellee Hotel Associates, Inc. (HAI), $13,000,000 in compensatory damages and $12,000,000 in punitive damages against appellant Holiday Inn Franchising, Inc. (Holiday Inn). On Holiday Inn's post trial motion, the circuit court reduced the compensatory award to $10,056,000 and the punitive award to $1,000,000. Both sides now appeal. Holiday Inn argues that the circuit court erred in denying its motion for a directed verdict on HAI's claims for fraud and promissory estoppel and in submitting the issue of punitive damages to the jury. HAI contends that the court erred in reducing the jury's damage awards and in granting a directed verdict on its breach-of-contract claim. We affirm on direct appeal and affirm in part and reverse in part on cross-appeal.

## I. Background facts

The following facts are derived from the evidence adduced during a five-day jury trial in July 2009. We view the evidence in the light most favorable to HAI, as the party in whose favor judgment was entered. *King v. Powell,* 85 Ark. App. 212, 220, 148 S.W.3d 792, 797 (2004).

HAI is a hotel ownership and management company owned by J.O. "Buddy" House. Prior to the onset of this lawsuit, Mr. House, who was engaged in the construction business, enjoyed a long and rewarding relationship with Holiday Inn dating back to the 1950s. He was particularly close to Holiday Inn's founder, Kemmons Wilson, and the two collaborated on several hotel-construction projects. House considered Wilson a man of his word, so much so that many of their projects were undertaken without benefit of a written contract.

In the 1970s, House expanded his business to include hotel ownership and operation, eventually owning several Holiday Inn franchises in Texas and Arkansas. His relationship with Holiday Inn continued to be characterized by the faith and informality that had defined his relationship with Kemmons Wilson. For example, when Bill Bradford of Holiday Inn approached House about converting certain Texas hotel properties to Holiday Inns, House bought the properties before obtaining the franchise licenses, simply on the strength of his trust in Holiday Inn. As

Bradford said, House was one of a group of owners who had been with Holiday Inn a long time and generally trusted that Holiday Inn would do what it said it would do.

¶3This was the state of things when, in the mid–1990s, Bradford asked House to look at a 242–room hotel in Wichita Falls, Texas, for possible conversion to a Holiday Inn. The facility had been operated by another corporation and had fallen into disrepair, but Bradford believed that House could make a success of it. House inspected the hotel and determined that a considerable amount of money would be needed to get the building into shape— more than he could recoup or turn a profit on under a normal, ten-year Holiday Inn franchise license. House therefore informed Bradford that he wanted a fifteen- or twenty-year license. Bradford, understanding House's need for assurance of a longer license term, took the request to Steve Romanella, Holiday Inn's vice president of franchising. Romanella declined to grant a fifteen- or twenty-year license, but he stated that, if House operated the hotel appropriately, there was no reason to think that he would not receive a license extension at the end of the ten years. Bradford conveyed this to House, and House, being satisfied that he would receive a license extension (if all went well), bought the hotel property and signed a ten-year franchise agreement with Holiday Inn on March 27, 1995.

House renovated the hotel in Wichita Falls and began what was, by all accounts, a successful operation. The facility generated substantial profits, and, after receiving several offers to buy the hotel, House considered selling it for as much as $15,000,000. He decided to retain the property, however, when his accountant informed him that he would make more money by seeking relicensure and continuing to operate the hotel for as long as possible. House therefore kept the hotel and made plans to seek early relicensure.

¶4Despite House's success in Wichita Falls, at least one member of Holiday Inn's franchise department, director of franchise development Greg Aden, decided that he would oppose House's continued operation and would instead advocate the licensure of another local hotel that was being operated as a Radisson. Aden prepared a business plan to this effect in 1999 and provided the plan to his superiors. He stood to gain a commission of approximately $13,000 to $14,000 if the franchise was redirected to the Radisson.[1] At some point, Aden shared his business plan with his contact at the Radisson, Mr. Patel; but neither Aden nor his superiors provided the plan to House or informed him of its existence. House was therefore unaware of the plan when, in 2001, his company contacted Holiday Inn to begin the early relicensure process.

In February 2001, Don Strahl of HAI spoke to a Holiday Inn representative about HAI's interest in early relicensure. The representative replied that HAI should forward $2500 for preparation of a Property Improvement Plan (PIP), which would detail all of the updates needed to the hotel's design and building specifications. HAI forwarded the $2500, and a Holiday Inn representative arrived to inspect the hotel within a few days. The result was an approximately thirty-page document detailing a wide variety of needed improvements, many of them involving major guestroom renovations. The document required HAI to submit certain design plans to Holiday Inn for approval, and it noted that HAI planned to spend approximately $2,000,000 on the project.

---

1. In the event of relicensure, Aden would not receive a commission.

Additionally, the PIP document, as well as Holiday Inn's correspondence with HAI, noted that the PIP was but one step in the application process; that it did not mean that Holiday Inn would approve the license application; and that the Franchise Approval Committee would be responsible for granting the application.

HAI in fact spent $3,000,000 on the renovations. As required, it submitted certain design choices to Holiday Inn, referencing the proposed relicensure, and Holiday Inn duly approved the choices. At no time did Holiday Inn mention Aden's business plan opposing HAI's relicensure. In fact, Aden, at some point, took one of Mr. Patel's associates, a Mr. Clancy, onto the premises at HAI's hotel and, without identifying Clancy as a representative of a possible competitor, obtained a tour of the hotel.

HAI completed the improvements required by the PIP in 2002. By that time, more than six months had passed since the PIP was issued, so Holiday Inn required a second PIP. HAI paid for another inspection and received a second, less-extensive PIP in October 2002. When those improvements were completed, HAI received a quality score of 96.05, which was considered good.

On October 3, 2002, Holiday Inn notified HAI that it had received an application from the Radisson to convert to a Holiday Inn. The letter stated that the Radisson was being considered as a possible partial replacement for HAI's Holiday Inn "should it leave the system." HAI immediately assured Holiday Inn that it wanted to continue operating its hotel and that it had just "completed a three million dollar PIP and [was] in negotiations for an extension or early renewal of [its] license." Soon thereafter, HAI received a call that the Radisson application had been denied and that HAI should immediately send in its application for relicensure, which had yet to be done. On December 19, 2002, HAI submitted the application, and the Franchise Approval Committee's consideration was scheduled for January 2003.

In early January 2003, two of Aden's supervisors, Brown Kessler and Steve Dietrich, asked Heather Botwinik of Holiday Inn to postpone HAI's relicensure hearing until they could re-visit the Wichita Falls area and possibly submit a "competing application." Botwinik emailed that she would agree to the delay on the condition that Buddy House be informed that "you are looking to reposition in the market" and that "he could possibly replace himself in the market." Otherwise, Botwinik said, changes to the agenda on such short notice would "stir up a lot of questions that he will want answers to that I may not be able to provide for him." Dietrich responded that Buddy House had been informed of a "replacement project" in November and that House "did not want to renew himself." Aden told Botwinik that House had been "thoroughly communicated with" on their intentions. At some point thereafter, Aden and his colleagues succeeded in reviving the Radisson application. The Franchise Approval Committee considered both the application from the Radisson, which was presented by Aden and his superiors, and the application from HAI, which was presented by Heather Botwinik. The Committee chose the Radisson and voted not to renew HAI's license.

After learning of the vote, House contacted Holiday Inn personnel to find out what had happened; he was unaware that the Radisson application was still under consideration. He told Holiday Inn that, while he had known that HAI was not guaranteed relicensure, there had "always been a realm of trust you could depend on." Ultimately, Brown Kessler of

Holiday Inn told House that the vote had been a "beauty contest"; in other words, the Radisson was the more attractive facility. HAI continued to operate the hotel through 2005 under its original, ten-year Holiday Inn license, then operated the hotel under other brand names before eventually selling it in 2007 for $5,000,000.

As the result of these events, HAI sued Holiday Inn on August 15, 2005, seeking compensatory and punitive damages and asserting causes of action for breach of contract, promissory estoppel, and fraud.[2] As developed at trial, HAI claimed that Holiday Inn's denial of the relicensure violated the implied covenant of good faith and fair dealing in the parties' contract; that Holiday Inn had promised to renew HAI's license at the end of ten years if the hotel was operated appropriately and that HAI had relied on that promise to its detriment; and that Holiday Inn fraudulently failed to disclose the Aden report advocating licensure of a competing facility in Wichita Falls. During the trial, Buddy House testified that, if he had known of the 1999 Aden report, he would not have spent the $3,000,000 on the PIP renovations in 2001 and 2002, and he would have sold the hotel in 1999–2001 for $15,000,000, rather than the amount he eventually sold it for in 2007, which was $5,000,000.

At the close of the proof, the circuit court granted Holiday Inn's motion for a directed verdict on the breach-of-contract count but denied its directed-verdict motion on the promissory-estoppel and fraud counts. The jury was instructed on those claims and returned a verdict in HAI's favor on both causes of action. It also awarded HAI $3,000,000 for amounts spent in renovating and improving the hotel; $10,000,000 associated with HAI's lost opportunity to sell the hotel; and $12,000,000 in punitive damages.

In a timely fashion, Holiday Inn moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial and remittitur. The circuit court, after a thorough and painstaking review of the motion, let the jury's liability verdict stand. The court, however, remitted the damage awards: the compensatory award was reduced from $13,000,000 to $10,056,000 in recognition of amounts that HAI had earned or profited from the hotel between 2000 and 2007, and the punitive award was reduced from $12,000,000 to $1,000,000. With regard to punitive damages, the court ruled that the award did not shock the conscience of the court and did not appear to be the result of passion or prejudice. However, the court concluded that the punitive damages ran afoul of federal due-process guidelines established in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

The above proceedings led to the appeal and cross-appeal now before us. Holiday Inn argues on direct appeal that the circuit court erred in 1) denying its motion for a directed verdict on HAI's claim for fraud; 2) denying its motion for a directed verdict on HAI's claim for promissory estoppel; and 3) submitting the issue of punitive damages to the jury. HAI argues on cross-appeal that the circuit court erred in 1) reducing the compensatory-damage award; 2) reducing the punitive-damage award; and 3) granting a directed verdict on its breach-of-contract claim.

## II. *Direct appeal—Directed verdicts on fraud and promissory estoppel*

At the close of the plaintiff's case, Holiday Inn moved for a directed verdict on

---

**2.** HAI also sued for breach of the Arkansas and Texas Deceptive Trade Practices Acts. Those counts were dismissed prior to trial and are not at issue on appeal.

fraud and promissory estoppel, citing several specific grounds.[3] The motion was renewed at the close of the proof, then denied by the court. Holiday Inn contends that this denial was error.

In reviewing the denial of a motion for a directed verdict, we must determine whether the jury's verdict is supported by substantial evidence. *King*, 85 Ark. App. at 220, 148 S.W.3d at 797. Substantial evidence is proof of sufficient force and character that it compels a conclusion one way or the other without resort to speculation or conjecture. *Id.* We review the evidence and all reasonable inferences therefrom in the light most favorable to the party on whose behalf judgment was entered. *Id.*

### A. Procedural issue

We first address HAI's contention that Holiday Inn's argument on this point is procedurally barred because the directed-verdict motions were not renewed at the conclusion of all evidence. Rule 50(e) of the Arkansas Rules of Civil Procedure provides that, in a jury trial, a person who does not have the burden of proof must move for a directed verdict "at the conclusion of all the evidence" to preserve a challenge to the sufficiency of the evidence on appeal. *See Willson Safety Prods. v. Eschenbrenner*, 302 Ark. 228, 232–33, 788 S.W.2d 729, 732–33 (1990). HAI asserts that the timing of Holiday Inn's motion did not comport with Rule 50(e).

The record reveals that, after the last witness in the case had testified, Holiday Inn's counsel stated, "That's all, Your Honor." The court then recessed for lunch and dismissed the jury. After the recess, with the jury still away from the courtroom, Holiday Inn renewed its previous motion for a directed verdict on all three counts—breach of contract, fraud, and promissory estoppel. The court granted a directed verdict on the breach-of-contract claim but denied the motion with regard to promissory estoppel and fraud. Following a lengthy colloquy over jury instructions that consumed the remainder of the day, the court reminded Holiday Inn's counsel that he had not rested in the jury's presence. The next day, the court opened the proceedings in front of the jury and asked if Holiday Inn had rested. Counsel stated that the defense rested, but counsel did not renew the motion for directed verdict at that time.

HAI contends that, because Holiday Inn did not move for a directed verdict after it formally rested its case before the jury, it did not comply with Rule 50(e)'s requirement that a motion for a directed verdict be made "at the conclusion of all the evidence." We disagree. The motion was made after the last witness had testified and before any instructions or arguments were made to the jury. *Cf. Robinson v. State*, 348 Ark. 280, 72 S.W.3d 827 (2002) (holding that a directed-verdict motion made after the jury was instructed was untimely); *State v. Holmes*, 347 Ark. 689, 66 S.W.3d 640 (2002) (holding that a directed-verdict motion made during closing arguments was untimely). Further, no additional proof was introduced after Holiday Inn renewed its directed-verdict motion, which distinguishes this case from *Davis v. State*, 2009 Ark. 478, 348 S.W.3d 553. In *Davis*, the appellant moved for a directed verdict in chambers, which the court denied. The appellant then returned to court and introduced several documents

---

3. With regard to fraud, Holiday Inn argued that it had no duty to disclose Aden's business plan to HAI and that HAI was contractually bound to operate the hotel as a Holiday Inn for ten years. On promissory estoppel, Holiday Inn argued that there was no evidence it had made a promise to HAI or that HAI reasonably relied on an alleged promise.

into evidence before resting. Our supreme court held that the appellant's directed-verdict motion was not timely because it did not come at the conclusion of all evidence. Here, by contrast, the proof was closed and remained closed at the time Holiday Inn renewed its motion for a directed verdict. The motion was therefore made "at the conclusion of all the evidence" and complied with Rule 50(e).

## B. Directed verdict on fraud

The elements of fraud are 1) a false representation of a material fact; 2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; 3) intent to induce action or inaction in reliance upon the representation; 4) justifiable reliance on the representation; and 5) damages suffered as a result of the reliance. *Wochos v. Woolverton*, 2010 Ark. App. 802, at 12, 378 S.W.3d 280, 288. On appeal, Holiday Inn challenges the sufficiency of the evidence on the first and third elements.

Regarding the first element, Holiday Inn points out that HAI's fraud claim was not based on a false representation of fact but on an alleged failure to disclose the 1999 Aden report. Holiday Inn contends that, because it had no fiduciary or other confidential or special relationship with HAI, it had no duty to disclose the report.

⌐12Generally, a mere failure to volunteer information does not constitute fraud. *Farm Bureau Policy Holders v. Farm Bureau Mut. Ins. Co.*, 335 Ark. 285, 302, 984 S.W.2d 6, 14–15 (1998). But silence can amount to actionable fraud in some circumstances where the parties have a relation of trust or confidence, where there is inequality of condition and knowledge, or where there are other attendant circumstances. *Id.* The duty to disclose is not limited to confidential or

fiduciary relationships, as Holiday Inn suggests. *See Camp v. First Fed. Savings & Loan*, 12 Ark. App. 150, 154, 671 S.W.2d 213, 216 (1984). There may be a special relationship or special circumstances requiring disclosure. *Id.* In determining whether such special relationships or circumstances exist, the events surrounding the parties' transaction may be considered. *Lambert v. Firstar Bank*, 83 Ark. App. 259, 265, 127 S.W.3d 523, 527–28 (2003).

In this case, substantial evidence supports the existence of a duty on Holiday Inn's part to disclose the Aden report to HAI. Buddy House had a long-term relationship with Holiday Inn characterized by honesty, trust, and the free flow of pertinent information. He testified that Bill Bradford's assurances at the onset of licensure in 1995 led him to believe that he would be relicensed after ten years if the hotel was operated appropriately. Yet, despite Holiday Inn's having provided such an assurance to House, it failed to apprise House of an internal business plan, developed only four years into his licensing period, that advocated licensure of another facility instead of the renewal of his license. A duty of disclosure may exist where information is peculiarly within the knowledge of one party and is of such a nature that the other party is justified in assuming its nonexistence. *Bridges v. United Savings Ass'n*, 246⌐13Ark. 221, 228, 438 S.W.2d 303, 306 (1969); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. First Nat'l Bank of Little Rock*, 774 F.2d 909, 913–14 (8th Cir.1985). Given House's history with Holiday Inn and the assurance he received from Bradford, we are convinced he was justified in assuming that no obstacles had arisen that jeopardized his relicensure.

Holiday Inn asserts that it would have provided Buddy House with the Aden report if he had asked for it. But, Holiday

Inn cannot satisfactorily explain why House should have been charged with the responsibility of inquiring about a plan that he did not know existed. Moreover, several Holiday Inn personnel testified that Buddy House in fact should have been provided with the Aden marketing plan. Aden himself stated that, if Buddy House told someone at Holiday Inn that he was interested in relicensing, House should have been given the plan. Company vice-presidents Brown Kessler and Kirk Kinsell similarly stated that if House had told Holiday Inn that he was interested in relicensing and wanted a PIP for that purpose, House typically would have been informed of the marketing strategy in order to evaluate the economic risk of spending millions of dollars. These witnesses intimated that Holiday Inn was not aware of House's desire for relicensing or his intention to spend a great deal of money on facility improvements. Yet, that intimation is not borne out by the proof. Holiday Inn's initial correspondence with HAI in February 2001 stated, "it was a pleasure speaking with you today regarding your potential early re-licensing. . . ." The thirty-page PIP, issued later in February 2001, contains a title page referencing the "proposed relicensing" of the hotel and notes HAI's intention to spend approximately $2,000,000 on the improvements. In light of these circumstances, we see no ground for reversal on this aspect of HAI's cause of action for fraud.

Holiday Inn argues next that HAI did not present sufficient evidence of the third element of fraud, i.e., that Holiday Inn intended to induce action or inaction in reliance upon a representation. Holiday Inn has failed to preserve this argument for appellate review. In its directed-verdict motion on HAI's fraud claim, Holiday Inn argued that it had no duty to disclose the Aden plan and that, in any event, HAI was bound to honor its contract to keep the hotel franchise for ten years. Holiday Inn did not argue that HAI failed to produce evidence of an intent to induce action or inaction in reliance on a representation. A party cannot change his argument on appeal and is bound by the scope of his argument below. *Exigence, LLC v. Baylark*, 2010 Ark. 306, at 10, 367 S.W.3d 550, 555. Further, even though Holiday Inn touched on this argument in its post trial motion, an argument made in a JNOV motion not previously made in a directed-verdict motion is not preserved for appeal. *Carr v. Nance*, 2010 Ark. 497, at 22, 370 S.W.3d 826, 839.

Based on the foregoing, we conclude that the jury's verdict on fraud was supported by substantial evidence and that the circuit court did not err in denying Holiday Inn's motion for a directed verdict.

## C. Directed verdict on promissory estoppel

To recover on the theory of promissory estoppel, HAI had the burden of proving the following propositions: 1) that Holiday Inn made a promise to HAI; 2) that Holiday Inn should have reasonably expected HAI to act or refrain from acting in reliance on the promise; 3) that HAI acted or refrained from acting in reasonable reliance on the promise to its detriment; and 4) that injustice can be avoided only by enforcement of the promise. AMI Civ. 2444 (2008); *see also Van Dyke v. Glover*, 326 Ark. 736, 744–45, 934 S.W.2d 204, 209 (1996); *Superior Fed. Bank v. Mackey*, 84 Ark. App. 1, 27, 129 S.W.3d 324, 341 (2003). The alleged promise at issue in this case was Bill Bradford's 1995 statement to Buddy House that, if HAI operated the hotel appropriately, there was no reason to think that HAI would not receive an extension of its license at the end of ten years. Holiday Inn argues on

appeal that the circuit court should have granted a directed verdict on promissory estoppel because 1) Bradford's statement did not constitute a promise, and 2) HAI did not rely on Bradford's statement.

 Because we ruled in the preceding section that the jury's fraud verdict should be upheld, we deem it unnecessary to reach the issue of whether a directed verdict should have been granted on HAI's promissory-estoppel claim. The verdict interrogatories used by the jury awarded damages of $3,000,000 in connection with the PIP improvements and $10,000,000 in connection with the lost opportunity to sell the hotel without differentiating between the two theories of recovery. Moreover, Buddy House testified that, if he had known of the 1999 Aden report—the basis for the fraud claim—he would not have spent the $3,000,000 on improvements and he would have sold the hotel for a net gain of $10,000,000. Thus, the fraud verdict supports the full, $13,000,000 compensatory-damage award, and any disposition of the promissory-estoppel claim on our part would be academic. Our court does not answer academic questions. *Kuelbs v. Hill*, 2010 Ark. App. 427, at 7, 379 S.W.3d 47, 52–53.

III. *Direct appeal—submission of punitive damages*

 Holiday Inn contends that the jury should not have been instructed on punitive damages because HAI proved no malice or intent to injure.[4] A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Carr*, 2010 Ark. 497, at 23, 370 S.W.3d 826, 839–40. We will not reverse a circuit court's decision to given an instruction unless the court abused its discretion. *Id.*

 We see no abuse of discretion here. Punitive damages may be proved not only by showing that the defendant intentionally pursued a course of conduct for the purpose of causing injury but also by showing that the defendant knew or should have known that, in light of surrounding circumstances, its conduct would naturally and probably result in injury and that it continued the conduct in reckless disregard of the circumstances, from which malice may be inferred. *HCA Health Servs. v. Nat'l Bank of Comm.*, 294 Ark. 525, 533, 745 S.W.2d 120, 125 (1988); AMI–Civil 2218 (2008). The evidence in this case, as recounted above, showed that Holiday Inn had a long-standing relationship with HAI and had assured HAI of relicensure if HAI operated the hotel appropriately; that Holiday Inn was aware that HAI was applying for early relicensure in 2001 and that HAI intended to spend millions of dollars in improvements as a result; that Holiday Inn, knowing that its files contained a marketing report advocating licensure of another facility, provided that report to HAI's competitor but stood by while HAI spent the PIP money and pursued relicensure, without providing the report to HAI; that Holiday Inn personnel knew that HAI should have received the report under the circum-

---

4. HAI contends that Holiday Inn's argument on this point is procedurally barred because Holiday Inn did not object to the punitive-damages instruction *and* seek a directed verdict on punitive damages. Both were not required. The failure to preserve a punitive-damages argument at one of these stages—directed verdict motion or objection to jury instructions—waives the argument on appeal. *Prendergast v. Craft*, 102 Ark. App. 237, 245, 284 S.W.3d 104, 110 (2008); *Superior Fed. Bank v. Mackey*, 84 Ark. App. 1, 20, 129 S.W.3d 324, 336 (2003). Holiday Inn preserved its argument at the jury-instruction stage.

stances; and that some Holiday Inn personnel made what appeared to be false statements and manipulated the Franchise Approval Committee's consideration of the competing application by implying that HAI had no interest in relicensing. These facts constitute "some basis in the evidence" to support Holiday Inn's knowledge that its conduct would naturally and probably result in injury but that it continued its conduct in reckless disregard of the consequences to HAI. Further, such deliberate deceit in the context of a fraud claim warrants submission of punitive damages to the jury. *See Firstbank of Ark. v. Keeling*, 312 Ark. 441, 446, 850 S.W.2d 310, 314 (1993).

Based on the foregoing reasons, we affirm on direct appeal.

## IV. *Cross-appeal—remittitur of compensatory damages*

■■■ HAI's first point on cross-appeal concerns the $10,000,000 awarded to HAI in connection with its lost opportunity to sell the hotel. Buddy House testified that he would have sold the hotel in the 1999–to–2001 time period for $15,000,000 had he known about the Aden report. Instead, he sold the hotel for $5,000,000 in 2007. That difference constitutes the jury's $10,000,000 verdict.

In a post trial motion, Holiday Inn argued that the jury failed to reduce HAI's $10,000,000 recovery by the amount that HAI earned or profited from hotel operations between the time it could have sold the hotel and the time it did sell the hotel.[5] The court agreed and deducted $2,944,000 from the jury's award for a new total of $7,056,000 on the hotel-sale damages.

HAI argues on cross-appeal that the court's remittitur was in error.

■■■ We review remittiturs de novo. *Carr v. Nance*, 2010 Ark. 497, at 25, 370 S.W.3d 826, 841. A remittitur is proper where the jury's compensatory award cannot be sustained by the evidence. *Id.* at 25–26, 370 S.W.3d at 841. The question for us is whether substantial evidence supports the jury's verdict. *Id.*

We uphold the compensatory-damage remittitur in this case. Buddy House's own testimony, as well as figures from HAI's spreadsheets, revealed that HAI generated $4,317,000 in net operating income between 2000 and 2007. House testified that his true net profit would be reduced by approximately $4,000,000 in interest he had paid during those years and that such interest would "almost wipe out" the $4,317,000 in net operating income. Thus, he sought the entire $10,000,000 in lost-sales opportunity without deductions for any earnings. On closer questioning, however, House referred to HAI's spreadsheet, which contained figures showing interest payments of only $1,373,000 between 2000 and 2007. After trial, the circuit court used that figure to reduce HAI's earnings from $4,317,000 and arrive at a true net-earnings figure of $2,944,000 between 2000 and 2007. That figure was, in turn, deducted from the jury's $10,000,000 damage award in connection with the sale of the hotel. In our de novo review, we concur with the court's calculations. They were based on objective evidence of HAI's earnings and expenditures and fulfilled the charge to the jury to reduce HAI's recovery by amounts "earned or profited."

---

5. The jury was instructed that it could award HAI the difference between the amount for which HAI could have sold the hotel and the amount for which HAI did sell the hotel, "less the amount that HAI earned or profited" between the time it could have sold the hotel and did sell the hotel.

HAI claims that the court did not consider depreciation as an additional factor in reducing HAI's earnings, but House testified that depreciation did not constitute a cash expenditure like the interest payments. HAI also argues that the court erred in including year 2000 net operating income in its calculations because House testified that he would not have sold the hotel for $15,000,000 until 2001. However, House did testify at one point that he could have sold the hotel in 1999 or 2000 for $15,000,000. We therefore affirm on this point.

## V. *Cross-appeal—remittitur of punitive damages*

HAI argues that the circuit court erred in reducing the punitive-damages award to $1,000,000 and that the jury's original $12,000,000 punitive-damages verdict should be restored.

■ Punitive damages are reviewed by our courts in a two-step process: first, whether the award is consistent with state law, and second, whether it violates the Due Process Clause, as analyzed by the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). *Allstate Ins. Co. v. Dodson*, 2011 Ark. 19, at 27, 376 S.W.3d 414, 431. The circuit court in this case found that the jury's $12,000,000 award passed muster under state law but ordered remittitur because the amount violated federal due-process guarantees. Our review is de novo. *Bronakowski v. Lindhurst*, 2009 Ark. App. 513, at 12, 324 S.W.3d 719, 726.

### A. State-law considerations

Our supreme court has set forth the following law related to remittitur and punitive damages in the context of state common-law analysis:

When considering the remittitur of punitive damages . . . we consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. Punitive damages are a penalty for conduct that is malicious or perpetrated with the deliberate intent to injure another. When punitive damages are alleged to be excessive, we review the proof and all reasonable inferences in the light most favorable to the appellees, and we determine whether the verdict is so great as to shock the conscience of this court or to demonstrate passion or prejudice on the part of the trier of fact. It is important that the punitive damages be sufficient to deter others from comparable conduct in the future.

*Advocat, Inc. v. Sauer*, 353 Ark. 29, 50, 111 S.W.3d 346, 357–58 (2003) (citations omitted) (quoting *Routh Wrecker Serv. v. Washington*, 335 Ark. 232, 240–41, 980 S.W.2d 240, 244 (1998)).

The circuit court in this case applied the above-mentioned factors and determined that, while Holiday Inn had no overall intent to harm the plaintiff, certain employees stood to gain financially from their actions, and their conduct was imputed to Holiday Inn. The court also noted that Holiday Inn was a multi-national company that had sold several hotels just prior to trial for an average price of $34,000,000 each. Under these circumstances, the court concluded that the jury's $12,000,000 punitive-damages award did not shock the conscience of the court and did not demonstrate passion or prejudice.

Because the circuit court upheld the jury's punitive-damages verdict under state law, HAI does not challenge this portion of the court's ruling. In our de novo review, however, we will remain

mindful of these state-law considerations as part of our overall evaluation of the punitive-damages award.

## B. Federal due-process considerations

■ In *BMW of North America v. Gore, supra,* the United States Supreme Court set forth three guideposts to consider in determining whether a punitive-damages award is excessive under federal law: 1) the degree of reprehensibility of the defendant's conduct; 2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive-damages award, also expressed as the ratio between compensatory and punitive damages; and 3) the difference between the punitive award and comparable civil penalties authorized or imposed in comparable cases. *Dodson,* 2011 Ark. 19, at 28, 376 S.W.3d 414, 431; *Jim Ray, Inc. v. Williams,* 99 Ark. App. 315, 321, 260 S.W.3d 307, 310 (2007). Both the appellate court and the circuit court are charged with conducting a thorough and independent evaluation of the jury's punitive-damages award using these three factors. *Jim Ray,* 99 Ark. App. at 321, 260 S.W.3d at 310.

■ The circuit court found that the jury's $12,000,000 award violated due process for the following reasons: the award was disproportionately high because Holiday Inn's failure to disclose the Aden report to HAI appeared to have been more of an accident; HAI was fully compensated for its losses, and the punitive damages would constitute an excessive windfall; and comparable civil penalties under Arkansas's Deceptive Trade Practices Act and Civil |₂₂Justice Reform Act were far less than the punitive-damages award. Before engaging in our own analysis, we note in particular that we do not share the circuit court's concern that the punitive damages will present a windfall to HAI. Even where the plaintiff has been made

whole by compensatory damages, punitive damages may be justified to punish the wrongdoer and to deter similar conduct in the wrongdoer and others. *Jim Ray,* 99 Ark. App. at 321, 260 S.W.3d at 310. Punitive damages are aimed not at compensation but retribution and deterring harmful conduct. *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 492, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008).

### 1. Degree of reprehensibility

■ In assessing the defendant's degree of reprehensibility, we consider the following factors: whether the harm to the plaintiff was physical or economic; whether the defendant's conduct evidenced an indifference or real disregard of the safety of others; whether the target of the defendant's conduct was financially vulnerable; whether the conduct involved repeated actions or an isolated incident; and whether the plaintiff's harm resulted from intentional malice, trickery, or deceit, or mere accident. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

■ Here, HAI's damages were purely economic; no individual's health or safety was compromised. However, infliction of economic harm may warrant substantial exemplary damages under the right circumstances. *Dodson,* 2011 Ark. 19, at 29–30, 376 S.W.3d 414, 432–33. In the very recent case of *Dodson, supra,* our supreme court reversed a remittitur in an economic-damage case where the trial court had remitted a $15,000,000 punitive-damages award to the sum of $6,000,000 to match those awarded for compensatory damages.

|₂₃As in *Dodson,* most of the evidence presented here reflected that the harm caused to HAI, although purely economic, was substantial. In the instant case, Holiday Inn, a multi-national corporation, failed to disclose valuable information to a

businessman who had worked with and trusted the company for over half a century. In doing so, Holiday Inn caused the businessman, over a period of more than a year, to expend significant sums of money on a hotel that he believed would be relicensed but whose relicensure certain Holiday Inn personnel were determined to thwart. Further, the nondisclosure of Holiday Inn's business plan, which Holiday Inn knew that HAI was entitled to have, combined with Holiday Inn's providing the plan to HAI's competitor, indicates, at the very least, outright disregard of HAI's interest as a franchisee and, at most, a deliberate attempt by certain Holiday Inn employees to reap their own economic benefits by keeping HAI in the dark. On these facts, notwithstanding the trial court's finding that Holiday Inn's nondisclosure appeared to be "more of an accident," we conclude that Holiday Inn's degree of reprehensibility supports a significant punitive-damages award. *See Dodson, supra.*

### 2. Ratio

Our courts have not established an acceptable, bright-line ratio of compensatory damages to punitive damages, but the U.S. Supreme Court in *Campbell, supra,* stated that, in practice, few awards exceeding the single-digit ratio will satisfy due process. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513.

In this case, the jury's $12,000,000 punitive-damages award is well within constitutional territory. The compensatory award, as reduced by the circuit court, is $10,056,000, yielding a ratio of 1.19–to–1. This is a far cry from the 145–to–1 ratio or the 500–to–1 ratio found constitutionally wanting in *Campbell* and *Gore,* respectively. This ratio also falls easily within the range of generally accepted ratios (most of which are single digit) that our courts have approved in other punitive-

damages cases. *See, e.g., Dodson, supra* (upholding jury award of $6 million in compensatory damages and reinstating the $15 million in punitive damages in actions for defamation and tortious interference with a business expectancy; ratio of 2.5–to–1); *Advocat, supra* (affirming on condition of remittitur but noting that a $63 million punitive damages award in a $15 million negligence and medical-malpractice action resulting in a ratio of 4.2–to–1 was not so "breathtaking" as to "raise a suspicious eyebrow"); *Bronakowski, supra* (finding a punitive-damages ratio of 42–to–1 in an action for improperly removing timber from an adjoining lot not so grossly excessive as to violate due process); *Jim Ray, supra* (remitting a punitive-damages award in a fraud and deceptive-trade-practices case to a ratio of 7–to–1); *Hudson v. Cook,* 82 Ark. App. 246, 105 S.W.3d 821 (2003) (affirming a punitive-damages award of $250,000 in a $35,000 compensatory-damage case involving replevin, conversion, and interference with a business and business expectancy resulting in a damages ratio of 7–to–1). *See also Exxon Shipping, supra* (stating that a ratio of 1–to–1 is the upper limit in a maritime case).

### 3. Comparable civil penalties

The Arkansas Deceptive Trade Practices Act imposes a $10,000 penalty for unconscionable trade practices. Ark.Code Ann. § 4–88–113(a)(3) (Repl.2001). Additionally, our Civil Justice Reform Act, which was not in effect at the time this cause of action arose, limits punitive damages to $1,000,000 in many circumstances. Ark.Code Ann. § 16–55–208 (Repl.2005). These statutes militate in favor of reducing the jury's punitive-damages award, but they are not alone dispositive. *Dodson,* 2011 Ark. 19, at 32, 376 S.W.3d 414, 434. When balanced against the reprehensibility of the defendant's con-

duct and a compensatory-to-punitive ratio of 1.19–to–1, our analysis compels a net result in favor of the jury's full punitive-damages award. We therefore find no due-process violation in the award of $12,000,000 and reverse on this point with instructions to restore the jury's punitive-damages award.

## VI. *Cross-appeal—directed verdict on breach of contract*

HAI argues that the circuit court erred in granting a directed verdict on its breach-of-contract claim. In its appellate brief, however, HAI states an intention to forego this issue in the event we affirm on direct appeal. Because we have affirmed on direct appeal, we need not address this point.

Affirmed on direct appeal; affirmed in part and reversed in part on cross-appeal.

VAUGHT, C.J., and GRUBER, J., agree.