BRANDON J. HARRISON, Judge
This appeal asks whether an adoption can stand. The circuit court allowed Luke and Amber Brunck to adopt Kristal Thompson's child, N.R.D. Kristal challenges that decision, arguing that she proved that her signature on the "Relinquishment of Parent and Child Relationship and Consent to Guardianship and Adoption"-which was attached to the Bruncks' petition to adopt N.R.D.-was procured by fraud (misrepresentation). Because the evidence proves that Thompson did not voluntarily sign a relinquishment affidavit, the circuit court clearly erred in failing to set the adoption aside.
I. Facts
The papers of record, and testimony taken during an April 2017 hearing on Kristal's petition to set the adoption aside reveal the following. Kristal gave birth to her daughter, N.R.D., while living in Houston, Texas. More than one year later, Kristal contacted Amber Biggerstaff, who lived in northwest Arkansas; the two had known each other since Kristal was three. According to Kristal, Amber offered to help her get on her feet, so Kristal and one-year-old N.R.D. lived with Biggerstaff for a week or two while Kristal looked for work. Kristal said that Amber was "very helpful" whenever she needed to work at night and that Amber "loved [N.R.D.] and she loved me." Kristal said she left for Jacksonville, Arkansas on 27 January 2017 to "get myself together, get financially stable, and then go back and get her [daughter]." The plan, according to Kristal, was for N.R.D. to stay with Amber temporarily.
During the hearing Kristal also testified that she signed an affidavit on 27 January 2017, which Amber had asked her to sign. Kristal said she thought the subject was to create a temporary guardianship with the purpose of authorizing Amber to take N.R.D. "to the doctor or daycare, put her on health insurance, take care of her better." She believed the guardianship was to last for six months. Kristal said that Amber was present when she signed the document-which she thought was a guardianship paper, not an adoption-related paper-but did not receive a copy. Kristal maintained that no one watched her sign the affidavit; and no one placed a notary seal on the affidavit in her presence.
*832 According to Kristal, the affidavit she signed already had a notary stamp on it, and "Jessica Martin" was the name that appeared as the notary on the same page that Kristal had signed. In other words, the document Kristal signed on January 27 was notarized by Jessica Martin before Kristal signed it. Kristal told the court that the document she signed on January 27 was not the "Relinquishment of Parent and Child Relationship and Consent to Guardianship and Adoption" that ended up being attached to the Bruncks' petition to adopt N.R.D.
This segues to a point that consumes a lot of words in the parties' briefs, which is that a copy of the relinquishment affidavit was notarized by two people: Jessica Martin and Amber Biggerstaff. It appears that Amber's notarization was an attempt to save the premature Martin notarization, which everyone agrees occurred outside of Kristal's presence. Kristal, however, said that the affidavit that has Amber's notarization attached to it was not the same paper (content wise) that she signed on January 27. Kristal explained that Amber "probably had me sign the other document and then scanned my signature onto this one [the relinquishment of consent]." Kristal also said that she did not see a ten-day deadline to revoke the relinquishment of her right to consent to an adoption in the document that she signed, and that she would have not signed it if she thought it could terminate her parental rights. Again, she thought the document gave Amber a "partial guardianship for a specific amount of time." Kristal acknowledged that she and Amber had talked about adoption, but adoption was not at issue when the affidavit was filed, according to Kristal.
During the April 2017 hearing Kristal also informed the court that she had texted Amber about the possibility of Amber and her husband adopting N.R.D. so the child's biological father could not try to take her away from Kristal. Apparently N.R.D.'s father was threatening "to take her to court" to get custody. Kristal agreed in a 9 February 2017 text message that Amber could adopt N.R.D. The court accepted as evidence, without any objection, long text exchanges between Kristal and Amber. Here is one that started on Thursday, February 9, at 12:44 p.m.:
KRISTAL : Hey, [N.R.D.'s] dad just text me today asking about her and I'm done fighting with him about her so I think he's gonna try to fight me for her.
AMBER : What would u like me to do? He has no rights first off. I have the guardianship paperwork but only way he wouldn't be able to have a chance at her is if I file it with the court clerk for adoption. We both know u are going to get her back but he doesn't have to know anything. If I file to adopt her he could never get her ever again. When u would want her back when u get settled i would just put her in ur guardianship. Basically same as we have it now but in the legal world she would be legally attached to junior [Biggerstaff's husband] and I. This would be the only way we could stop him legally. Once u would say okay I'd file it and he would be stopped. His rights would be stripped. If u didn't do it this way he will always be able to go file and to have visitation or file to get permanent custody due to saying you have no way to care for her. You don't want that babe. We do this all the time for like younger girls that have a baby will sign the baby over to baby moms parents so the father of the baby could never have a chance to take the child away from the young mom due to her not having her own house or anything.
*833 KRISTAL : Yeah go ahead and file it.
....
AMBER : Jokes on him cause he done f* * * *d with the wrong person!! Lol this is what I do for a living. I can also send him a copy of the adoption order so he knows from a legal office and judge. If he asks what the hell u did that for just say it was best for [N.R.D.] and u wanted too. Boom done and over for the rest of her life.
....
KRISTAL : Okay cool. Does [N.R.D.'s] last name have to be changed[?]
AMBER : A judge wouldn't look at u bad for wanting her to be adopted by us at all either they would think better of u for putting her first. The judge and I go to lunch all the time so I'll have him do it quickly and send kourtni and him the papers asap No it doesn't have to be changed at all. Legally she would be listed as Biggerstaff but I don't have to change her name on social security cards or birth certificate ever if U don't want us too. [child's name] and [child's name] are Biggerstaff's legally but social and birth certificates are still their old names.
KRISTAL : Okay cool that works. Thank you so much momma bear.
AMBER : No problem babe. I will always have ur back and [N.D.R.'s] too. Just send them a text saying "Listen I knew I was struggling and needed to get myself together so I made the decision to have Aunt Amber adopt [N.D.R.] before I left Fayetteville. It was the best thing for [N.D.R.] If you need or want details u c any info." An call her at [Amber's cell phone #] but legally she's been adopted and it's been a done deal for over 3 weeks now. U will have to take it up with Amber if u need
KRISTAL : Okay I will
AMBER : Getting settled at ur dads house Make them think u did it before u left legally and u didn't want to tell them she was adopted already because u didn't want to upset anyone while u were I have hi address still so I will send him papers. [c]hild's parents automatically is considered abandonment in the court of law. Since he hasn't seen her in a year the rights he could of had were voided and Also, if he asks how u were able to sign her to be adopted without him being notified tell him after a year of no visits or contact from either one of a c legally he abandoned his rights to her
The next day, February 10, more texts were exchanged:
KRISTAL : I changed my mind about doing the adoption, but I'm not gonna tell [N.D.R.]'s dad any different
AMBER : Kristal I filed it already yesterday afternoon. It's nothing different than what we already are doing.
KRISTAL : Aww well dang. Okay.
AMBER : We can keep it between us and no one else if u are worried about that. My lips are sealed. Nothing has changed. She is still your little baby and will always be. Everything is the same as it was yesterday morning. We just did it to keep anyone from taking her from you while u are getting ur stuff together. That's it. No one not dhs not her dad not anyone can take her from u for the rest of her life. No worry on ur part.
KRISTAL : Okay that works
AMBER : I'm sorry love. I didn't know any different. At least this way u have no worries with her or will u ever have to in the future. Love you.
Don't worry about it. Nothing has changed. I will never tell a sole because *834 no one needs to know nor will they ever know because nothing will change. Did something happen that made u change ur mind? Something worry u?
KRISTAL : I'm worried that I won't have the title of her mother legally.
AMBER : Baby it doesn't work like that.
KRISTAL : Aww okay. Well, I'm good then
AMBER : It's not that type of adoption. U still would be legally listed as the momma
KRISTAL : Aww so I still have full control of decision making with her, but y'all are the secondary parents of her
AMBER : That's a fear I can understand but that's not the type of adoption we did. It is basically just adding junior and I as her father. U still are momma but we are listed as well. Understand? Different type of situation from ours makes the rights legally change and mother name removed. Not our type ... Basically saying u me and junior are parents of her and we all share joint custody Like a divorce with joint custody
KRISTAL : Okay that works.
AMBER : Lol okay. Going in to court love my girl
KRISTAL : Love you too.
Kristal was asked during the hearing what she believed an "adoption did" when she agreed by text messaging that Amber should file the "guardianship papers." She replied, "The way she made it seem was that it was just like joint custody, so I would have her sometimes and she would have her sometimes." Yet Kristal also stated that Amber told her an adoption would terminate her rights.
On cross-examination, Kristal agreed that she believed the paperwork she signed could be used for guardianship or adoption, which is what Amber had told her. Though questioned extensively, Kristal remained firm that she did not sign the file-marked "Relinquishment of Parent and Child Relationship and Consent to Guardianship and Adoption" that Amber's counsel showed her. (The document that both Martin and Amber had notarized.) Kristal also disagreed with Amber's deposition testimony wherein Amber said that she watched Kristal sign the relinquishment affidavit, which Amber notarized later.
Speaking of Amber's deposition testimony, Kristal introduced it during the hearing through a reader.[1] Here is the testimony that Amber provided the court. On 27 January 2017, while in Amber's kitchen, Amber presented to Kristal a "Consent to Adoption" and read it aloud twice. Amber said Kristal indicated that she understood the document. She said that she saw Kristal sign the affidavit. Amber said that she did not notarize the document immediately because "we were unsure at the time if we were going to keep [N.R.D.] or if we were going to place her with someone else," but she notarized it later. Amber maintained that Kristal signed the affidavit that was filed as an attachment to the Bruncks' adoption petition. Amber agreed that Kristal did not discuss this process with any *835 independent legal counsel or other professional. By trade, Amber is a paralegal, office manager, and notary.
Amber admitted (through her deposition testimony) that when the text messages were exchanged on February 9 and 10, a petition to adopt N.R.D. had not yet been filed. She disagreed that she had told Kristal that the adoption of N.R.D. "would still go to Kristal and that the adoption was just to keep the father from being able to take [N.R.D.] from Kristal." (Amber did, however, affirm that she sent the texts, some of which plainly contradict this denial.) Amber also testified that she did not perform adoptions as a profession. She said that she was trying to be "supportive" of Kristal and was "consoling" her. Amber also said that she didn't know what she meant by the texts and was not "in a legal standpoint to tell her anything." Amber denied that she misled Kristal to keep her from contesting the adoption.
Back to the text messages. Here is another prominent exchange that was before the circuit court. On Sunday, February 20, Kristal wrote, "God has opened up a lot of doors and I intended it would take longer than this, but I'm ready for [N.R.D.] to come live with me[.]" Amber responded, in part, "Ur not anymore ready today then u were a month ago." Here is Kristal's reply:
I wasn't aware that I had to ask for her back, but okay. I respect how you feel, but I need my daughter back and it's a simple as that. I'm sorry that everything is going the way it is and I know you're very protective and want me to be okay, but I'm not okay momma bear. I didn't think it would affect me this much or this bad, but it is. I'll come get her if you can't bring her to me for some reason.
The next day, Monday, February 21, Kristal asked Amber to have everything ready for her to pick up N.R.D. the next weekend-the birth certificate, Social Security card, and other items she had left with Amber. After several more exchanges, this textual bomb dropped:
KRISTAL : Aunt Amber, I want my baby back, what are you trying to tell that I have to do to come and get my baby back because you told me that I could come get my baby back when I was ready, so what are you telling me that I have to do to get my baby back?
AMBER : This isn't how it works Kristal. Would u like to speak to the attorney?
KRISTAL : Yes ma'am I would like to speak to the attorney so we undo the paperwork and I can get my baby.
AMBER : U can't undo the paperwork. I can sign her over but the paperwork can't be undone. Legal papers don't work like that.
KRISTAL : That's not how you explained it to me.
AMBER : Yes it is Kristal. No one has done anything without u knowing[.]
....
KRISTAL : Can I have the number for the attorney? I'll call them myself, so I need the name and the number the attorney's office that you're talking about.
AMBER : Yep u can. Please call him [Justin Heimer (appellees' counsel) ] cause he can tell u how it's all done and over with and also how being an ass to me does nothing good for anything[.]
....
KRISTAL : Thank you for the information.
AMBER : Welcome maybe then u will know I haven't lied to u not would I start too. He can clear it all up.
The following day generated this exchange:
AMBER : Kristal u just called the adoption attorney and u 3 were screaming *836 and yelling at him! Have you lost your mind? Why are u letting ur mom do this? Makes no sense. What in the world happened? This is crazy! I'm at the point where I'm done communicating because ur not being honest and making me out to be the bad person. Ur moms not doing anything for u I hope you know this. She isn't helping the situation at all
and only making it worse. How could u say that stuff about me when we have done nothing but love [N.R.D.] and take care of her? This is crazy and it's sad ur mom is making it only worse for you. Tried to tell u that.
KRISTAL : How could you trick me and give my daughter away to someone else ... I never agreed for her to be given to anyone else besides you and Junior, but I was also still gonna have custody and my rights to her long enough to get me together for [N.R.D.] and I. You mislead me to think that the temporary guardianship document that I signed in your home in your kitchen and agreed upon was something it's not. The document I signed said temporary guardianship with the time frame of 6 months or whenever I wanted my baby. You knew that I had every intention to come back and get [N.R.D.]. You led me to believe that all of this was temporary and I can get my baby back at any time. All of this came about when you came home from work and you told me that you couldn't put [N.R.D.] on your insurance and you brought up the temporary guardianship for the sole purpose of being able to take [N.R.D.] back and forth to the doctor. Now you've got me fighting for my daughter, why would you do something like this to me, momma bear? I trusted you and you broke my heart by doing this to me and [N.R.D.].
On Wednesday, February 23, the Bruncks filed a petition for adoption in the Washington County Circuit Court. (The record leaves us wondering how and when and why the Bruncks suddenly appear in this legal drama.) A "Relinquishment of Parent and Child Relationship and Consent to Guardianship and Adoption" and what appears to be Kristal's signature was attached as exhibit B. The pages that constitute the relinquishment document are unnumbered. Amber Biggerstaff's notary stamp and acknowledgement is on a separate page than the one where Kristal's signature appears with the notary stamp and acknowledgment of Jessica M. Martin. All the parties concede that Martin did not see Kristal sign the document. Kristal's signature is dated 1-27-17, as is Biggerstaff's signature.
The Bruncks' statement of expenses, criminal-background check, and putative-father's-registry check was filed on February 27 as a supplement to their petition. The supplement also lists $8,600 in attorney fees and $3,000 in reimbursement for a temporary caretaker (the Biggerstaffs).
The adoption decree was entered later that day, on 27 February 2017. The order states, in part:
The unmarried, biological mother of said child has relinquished her parental rights and obligations to the said child and has consented to this adoption. The five-day statutory withdrawal period ended on February 1, 2017, and no revocation occurred. Further notice to the biological mother or her further consent is not required, and her legal parental rights are now terminated.
The court changed N.R.D.'s name and found, without apparently ever having questioned them, that it was in her best interest to be adopted by the Bruncks, *837 who reside in Ohio. The February 27 decree also states that "six months from this date this Decree shall be self-executing and become final without any subsequent hearing being required[.]"
On 9 March 2017, Kristal moved to set aside the judgment (adoption). She alleged the affidavit with her signature on it, which was used to support the adoption petition, was obtained by "serious fraud, emotional coercion, misrepresentation, and undue influence." She alleged that her signature was forged, or in the alternative, that the signature page was removed from the original document she signed and later attached to the affidavit filed with the adoption petition. She asked the court to vacate the adoption decree and for injunctive relief. Attached to her motion were copies of the text messages between Amber and Kristal that we recited earlier.
The court entered a written order on May 22 that denied Kristal relief. In it, the court adopted the findings it made in its May 2 letter opinion. The court found that the affidavit Kristal signed in Amber's presence on January 27 was, in fact, the Relinquishment of Parent Child Relationship and Consent to Guardianship and Adoption attached to the Bruncks' adoption petition. It also found that Kristal signed a consent to adopt in Amber's presence, that Amber did not commit an intentional fraud inducing Kristal to sign the adoption consent, and that Amber's "notarization of the consent to adoption was not invalidated by the fact that, although she witnessed the signing of the document, she did not notarize said document until later."
The circuit court also found that Amber's representations in the text messages "are in fact misrepresentations, whether made with good intentions or not." But it then ruled that any misrepresentations that Amber had made to Kristal were not made as an agent for the Bruncks. And the court wrote, "Of great importance to the court's decision" was that these misrepresentations were made after 1 February 2017, so they were "legally irrelevant" because the misrepresentations were made after Kristal's consent to adoption became irrevocable, and therefore could not result in setting aside the adoption.
II. Law
We review adoption proceedings de novo, and the circuit court's decision will not be set aside unless clearly erroneous. Bridges v. Bush , 93 Ark. App. 461, 220 S.W.3d 259 (2005). In cases involving minor children a heavier burden is cast upon the circuit court to utilize fully all its power of perception in evaluating the witnesses, their testimony, and the children's best interest. Id. An appellate court has no such opportunity, and we know of no case in which the superior position, ability, and opportunity of the circuit court to observe the parties carries as great a weight as one involving minor children. Id.
Adoption statutes run against the common law and must therefore be strictly read and applied. In re Adoption of Parsons , 302 Ark. 427, 791 S.W.2d 681 (1990). Our supreme court has said:
[T]he power of the court in adoption proceedings to deprive a parent of her child, being in derogation of her natural right to it, and being a special power conferred by the statute, such statute should be strictly construed; that the law is solicitous toward maintaining the integrity of the natural relation of parent and child; and in adversary proceedings in adoption, where the absolute severance of that relation is sought, without the consent and against the protest of the parent, the inclination of the courts, as the law contemplates it should be, is in favor of maintaining the natural relation.... Every intendment should have *838 been [in] favor of the claim of the mother under the evidence, and if the statute was open to construction and interpretation it should be construed in support of the right of the natural parent.
Id. at 432, 791 S.W.2d at 683-84 (internal citations and quotations omitted).
Strict compliance with the statute providing for a consent to adoption is required. Roberts v. Swim , 268 Ark. 917, 597 S.W.2d 840 (1980). Parents may consent to adoptions by executing them "in the presence of the court" or "in the presence of a person authorized to take acknowledgements." Ark. Code Ann. § 9-9-208 (Repl. 2008). But there is also a method to relinquish a parental right to consent. That option is in section 9-9-220, which partly states:
(a) With the exception of the duty to pay child support, the rights of a parent with reference to a child, including parental right to control the child or to withhold consent to an adoption, may be relinquished and the relationship of parent and child terminated in or prior to an adoption proceeding as provided in this section....
(b) All rights of a parent with reference to a child, including the right to receive notice of a hearing on a petition for adoption, may be relinquished
and the relationship of parent and child terminated by a writing, signed by an adult parent, subject to the court's approval.... The signing shall occur in the presence of a representative of an agency taking custody of the child, or in the presence of a notary public, whether the agency is within or without the state, or in the presence and with the approval of a judge of a court of record of this state or any other state in which the minor was present at the time it was signed. The relinquishment shall be executed in the same manner as for a consent to adopt under § 9-9-208.
(1)(A) The relinquishment may be withdrawn within ten (10) calendar days, or, if a waiver of the ten-day period is elected under subdivision (b)(3) of this section, five (5) calendar days after it is signed or the child is born, whichever is later.
(i) Notice of withdrawal shall be given by filing an affidavit with the probate division clerk of the circuit court in the county designated by the writing as the county in which the guardianship petition will be filed if there is a guardianship, or where the petition for adoption will be filed, if there is no guardianship. If the ten-day period, or, if a waiver of the ten-day period is elected under subdivision (b)(3) of this section, the five-day period ends on a weekend or legal holiday, the person may file the affidavit the next working day.
Ark. Code Ann. § 9-9-220. Even when a final adoption decree has been entered, a statutory consent to adopt may be withdrawn when fraud, duress, or intimidation is proven. Dale v. Franklin , 22 Ark. App. 98, 733 S.W.2d 747 (1987).
Setting aside an adoption is, of course, not an easy thing to do for obvious reasons. In McAdams v. McAdams , 353 Ark. 494, 109 S.W.3d 649 (2003), our supreme court made this point:
The fraud for which a decree will be canceled must consist in its procurement and not merely in the original cause of action. It is not sufficient to show that the court reached its conclusion upon false or incompetent evidence or without any evidence at all, but it must be shown that some fraud or imposition was practiced upon the court in the procurement of the decree, and this must be something more than false or fraudulent acts or testimony the truth of which was, or *839 might have been, in issue in the proceeding before the court which resulted in the decree assailed.
....
The law is settled that the fraud which entitles a party to impeach a judgment must be fraud extrinsic of the matter tried in the cause, and does not consist of any false or fraudulent act or testimony the truth of which was or might have been in issue in the proceeding before the court which resulted in the judgment assailed. It must be a fraud practiced upon the court in the procurement of the judgment itself.
Id. at 499, 109 S.W.3d at 652 (internal citations omitted). The party seeking to set aside the judgment has the burden of showing that the judgment was obtained by fraud, and the charge of fraud must be sustained by clear, strong, and satisfactory proof. Id. at 499, 109 S.W.3d at 652.
III. Analysis
Kristal argues that the circuit court erred in failing to set aside the adoption decree because there was fraud upon the court when the consent was presented as an original document that was properly executed and notarized; and the court erred when it failed to set aside the adoption decree and prevent a miscarriage of justice. "It would be a gross miscarriage of justice to allow an unwilling mother to lose her child where she was tricked into signing a document by a notary public and the document was determined to have terminated her parental rights five days later," says Kristal.
The Bruncks maintain that the adoption should not be overturned, reasoning that any statement by Amber Biggerstaff is "legally irrelevant" because Kristal could no longer revoke her consent and therefore her "inaction" could not have been based on Amber's statements. They also say that their identity was not known to Amber when she made the statements-and that while Kristal "may have a legal action against Biggerstaff ... [she] cannot have a cause of action against [them]." They concede, however, that if the "consent to adoption form is invalid the adoption decree should be set aside."
We hold that the court's decision to refuse to set aside the adoption decree was clearly erroneous. As we said earlier, adoption proceedings run against the natural rights of parents, and statutes permitting adoptions must be construed in a light favoring natural parents' rights. Ducharme v. Gregory , 2014 Ark. App. 268, 435 S.W.3d 14. Although the face of the relinquishment affidavit attached to the Bruncks' adoption petition reflects that Kristal may have well signed it, we must consider the surrounding circumstances to determine if Kristal's signature was procured by misrepresentation, fraud, or the like. See Dale v. Franklin , 22 Ark. App. 98, 733 S.W.2d 747 (1987) (consent to adopt may be withdrawn upon a proper showing of fraud, duress, or intimidation). To ignore the contextual facts and accept a signature always at face value is to allow a potential fraud or the grossest of manipulations to conceal themselves too readily.
The circuit court agreed that Amber's statements in the text messages were "misrepresentations." Correct. It erred, however, by declaring them irrelevant. A false representation of a past or present material fact, when one has a duty to speak the truth, is a fraud when another detrimentally relies on the representation. See Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc. , 2011 Ark. App. 147, 382 S.W.3d 6. Moreover, a legal duty can arise when one person has placed a special confidence in another person; in which case the latter person is bound, in equity and good conscience, to act in good faith and *840 with due regard for the interests of the other. Id. That is the case here. Put bluntly, Amber owed a duty of full disclosure to Kristal given the special and sensitive circumstances.
Kristal neither signed, nor understood, the relinquishment affidavit in a contextual vacuum. As her testimony and the text messages trumpet, she signed with this in mind: she and Amber had a temporary plan, one that Amber admittedly changed. Kristal signed a document that she believed gave Amber the ability to temporarily care for N.R.D. in some stated particulars-like taking the child to the doctor and putting her in daycare while Kristal got on her feet financially. In this joint scheme, adoption was considered solely as an option for Amber and her husband to adopt N.R.D. with the purpose of preventing N.R.D.'s biological father from requesting custody. Setting aside the moral morass that the conspiratorial plan raises from the father's perspective-and that Amber doled out "legal advice" as if from a Pez dispenser-the written evidence established that Kristal wanted to proceed with an adoption, if at all, on the (mis)understanding that she could share "joint custody" of N.R.D. with the Biggerstaffs. There is no evidence to the contrary.
Unbeknownst to Kristal, the Biggerstaffs were not the would-be adoptive parents; two people who lived in Loveland, Ohio, and whom Kristal had never met or communicated with, were the targets. The parties' briefs do not explain how the Biggerstaffs know the Bruncks. The parties' briefs do not explain how the Kristal/N.R.D./Amber triangle morphed into a Kristal/N.R.D./Bruncks triangle.
What we do know is that the Bruncks apparently did not testify during the hearing that was convened for the sole purpose of deciding whether their adoption had been procured by a fraud. It is unclear if they were even present at the hearing. What we do know is that Kristal grew increasingly uncomfortable with the arrangement and, within a few short weeks, had expressly pleaded with "momma bear" to give her child back. Amber replied that the paperwork could not be undone.
KRISTAL : Aunt Amber, I want my baby back, what are you trying to tell that I have to do to come and get my baby back because you told me that I could come get my baby back when I was ready, so what are you telling me that I have to do to get my baby back?
AMBER : This isn't how it works Kristal. Would u like to speak to the attorney?
KRISTAL : Yes ma'am I would like to speak to the attorney so we undo the paperwork and I can get my baby.
AMBER : U can't undo the paperwork. I can sign her over but the paperwork can't be undone. Legal papers don't work like that.
KRISTAL : That's not how you explained it to me.
AMBER : Yes it is Kristal. No one has done anything without u knowing[.]
The Bruncks' petition to adopt had not yet been filed and no adoption order had yet been entered when Amber provided this "legal advice." And, again, as far as we can tell, the record does not establish that Amber told Kristal that N.R.D. was headed to a couple who lived in Ohio. Nor did she arguably disclose to Kristal that she later notarized Kristal's signature on a separate page and then used that notarized signature to support an out-of-state adoption.
IV. Conclusion
Kristal had to prove that she did not voluntarily execute the relinquishment affidavit *841 because of fraud or misrepresentation. She did. The circuit court mistakenly allowed Ark. Code Ann. § 9-9-220 to, essentially, shield an adoption that was carried out under fraudulent circumstances. Because we are firmly and definitely convinced that a mistake was made when the adoption was not set aside, the circuit court's orders are reversed and the adoption is set aside forthwith.
Reversed.
Gruber, C.J., and Glover, J., agree.

Amber Biggerstaff did not attend the April 2017 hearing on Kristal's motion to set aside the adoption. A certified copy of Biggerstaff's seventy-page deposition is included in the record on appeal. It is file-marked 5 April 2017, one day before the April 6 hearing. Portions of her deposition were read during the hearing. The record is not clear whether the circuit court received as evidence the entire deposition or only the portions read aloud during the hearing. The answer does not ultimately matter because no party objected to the deposition being included in the appeal record, and both parties cited it in their appellate briefs. For this opinion's purpose, we have only drawn from the deposition testimony that was read into the record during the hearing.